### In re CORNERSTONE PROPANE PARTNERS, L.P. SECURITIES LITIGATION

No. C 03–2522 MHP.

United States District Court, N.D. California.

Feb. 7, 2005.

---

Frank M. Holozubiec, Galia Messika, Peter A. Bellacosa, Wendy E. Long, Frank J. Riebli, Kirkland & Ellis, LLP, New York City, for Cornerstone Propane Partners, L.P.

## ORDER

PATEL, District Court Judge.

Plaintiffs, a consolidated class, brought this action against defendants CornerStone Propane Partners L.P. ("CornerStone") and several of its top executives and directors ("individual defendants"), alleging that defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The action against CornerStone has been stayed pending bankruptcy proceedings. The class consists of purchasers of CornerStone common units during the period July 29, 1998 through and including February 11, 2003 (the "class period"). Now before the court is the individual defendants' motion to dismiss for failure to state a claim. Having considered the arguments of the parties and for the reasons set forth below, the court enters the following memorandum and order.

### BACKGROUND [1]

CornerStone, a publically-traded limited partnership organized under the laws of Delaware, is the country's sixth largest national wholesale and retail marketer of propane, serving over 440,000 customers in more than 30 states. On February 11,

---

1. All facts in this section are drawn from the Corrected Consolidated Amended Class Ac- tion Complaint, unless otherwise noted.

2003, CornerStone admitted in its Form 8–K securities filing that it would have to restate its financial results for fiscal years 2000 and 2001 due to reporting errors during those years. Plaintiffs have alleged that during the class period, CornerStone engaged in fraudulent manipulation of the securities markets by making false and misleading public statements that artificially inflated the value of CornerStone's common units. CornerStone's common units had traded as high as $22 per share during this period of time; by February, 2003, when news of this apparent deception had reached the market, share price had declined to $0.35. Plaintiffs allege that the market capitalizations lost during this period amounted to over $360 million.

Eight plaintiffs filed class-action lawsuits against CornerStone on behalf of themselves and other similarly-situated investors, charging that they purchased CornerStone stock during the class period in reliance on CornerStone's fraudulent misrepresentations and suffered financial losses as a result. Five parties filed motions seeking to consolidate these eight class action lawsuits and to have themselves named lead plaintiff. On October 3, 2003, this court granted Gilbert H. Lamphere's motion for consolidation and appointed him as lead plaintiff for the class. A Consolidated Amended Class Action Complaint was filed on October 27, 2003; a Corrected Consolidated Amended Class Action Complaint was filed on March 2, 2004.

The complaint names CornerStone, as well as several of its individual executives and directors,[2] as defendants and controlling persons. CornerStone filed a Suggestion of Bankruptcy on June 15, 2004, notifying this court of its voluntary petition in the United States Bankruptcy Court for the Southern District of New York seeking relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. section 101 et seq. Accordingly, the bankruptcy court entered an automatic stay of proceedings against Cornerstone Partners or its property pursuant to 11 U.S.C. section 362(a).

CornerStone is a Master Limited Partnership that was created in 1996 by North-Western Corporation ("NorthWestern"). The Partnership is composed of CornerStone G.P., Inc. (the Managing General Partner) and SYN, Inc. (the Special General Partner). NorthWestern was the majority unit-holder during the class period and parent of the CornerStone partnership's Managing General Partner. The original iterations of the complaint named NorthWestern Corporation as a defendant, but the company has subsequently filed for bankruptcy and is no longer named as a party to this action.

The sequence of events described in the complaint begins with CornerStone's initial public offering in December, 1996. The complaint alleges that CornerStone was especially attractive to investors due to its

---

**2.** The individual defendants in this action include five officers of CornerStone, as well as three directors of NorthWestern who also served as directors of CornerStone. The officers include: (1) Keith G. Baxter ("Baxter"), the company's Chief Executive Officer and Director at all relevant times, (2) Ronald J. Goedde ("Goedde"), the company's Executive Vice President and Chief Financial Officer through 2001, (3) William L. Woods ("Woods"), the company's Vice President of Acquisitions, (4) Charles J. Kittrell ("Kittrell"), the company's Executive Vice Presi-

dent and Chief Operating Officer, and (5) Richard G. Nye ("Nye"), the company's Vice President of Finance of the general partner since 1999 and the company's Chief Financial Officer after 2002. The directors of the Managing General Partner include: (1) Merle D. Lewis ("Lewis"), who was at all relevant times the Chairman of the Board of the Managing General Partner, (2) Richard R. Hylland ("Hylland"), who was the Vice Chairman of the Board of the Managing General Partner, and (3) Daniel K. Newell ("Newell"), a director of the Managing General Partner.

quarterly distribution of "available cash," defined as the cash available at the end of each quarter less the amount of cash reserves established by the Managing General Partner's reasonable discretion. The partnership's stated intent was to ensure sufficient available cash to make a minimum quarterly distribution ("MQD") of at least $0.54 per common unit per quarter.

The partnership established earnings before income taxes, depreciation, and amortization ("EBITDA") as an indicator of CornerStone's strength and ability to make MQDs. According to the complaint, the use of the EBITDA indicator became fertile terrain for manipulating expenses to give a false impression of healthy cash flows. In addition, the partnership established the Annual Operating Performance Incentive Plan, a program which paid annual incentive bonuses marked to budget. The bonus pool for top executives amounted to as much as 10% of the excess of EBITDA over budget.

A second prong of the company's business strategy consisted of an aggressive acquisitions policy intended to control for the highly seasonal, weather-dependent price volatility of the propane market. Between 1997 and 2000, the Partnership acquired a total of 43 businesses. An Acquisition Incentive Plan in place between 1997 and 2002 fueled this growth through a program of bonuses for employees involved in acquiring new businesses. Over $7 million in incentives were distributed between 1997 and 2001, as well as additional annual stipends flowing to the directors of the Managing General Partner.

A series of unusually warm winters began in 1998, negatively affecting CornerStone's earnings. In addition, the partnership was increasingly leveraged, financing acquisitions through debt rather than the issuance of equity. Despite an increasingly destabilizing debt load, CornerStone issued press releases heralding "record results" and increased earnings from the beginning of the class period in 1998 through 2001. The complaint alleges that CornerStone remained an attractive investment because it continued to pay MQDs, and its partnership form offered tax advantages. Analysts agreed.

In July, 2001, CornerStone announced that the Minimal Quarterly Distribution ("MQDs") to common unit holders would be reduced to $0.22. CornerStone discontinued MQDs altogether in January, 2002, also announcing at that time that the company would pursue strategic options, including possible sale or merger. For reasons related to the Enron collapse, CornerStone terminated Arthur Anderson LLP as its auditor on May 23, 2002, retaining Deloitte & Touche in its place. Soon thereafter, in July, 2002, the company terminated individual defendants Baxter, Goedde, and Kittrell, CornerStone's Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer, respectively. In August, 2002, the New York Stock Exchange de-listed CornerStone's common units. Later that year, NorthWestern terminated CornerStone's debt financing, causing CornerStone to default on a $5.6 million bond payment.

In February, 2003, CornerStone released a flood of bad news. In its February 10, 2003 Current Report on Form 8–K, CornerStone revealed its decision to write-down CornerStone's goodwill by approximately $150 million, as well as restate CornerStone's financial statements for fiscal years 2000 and 2001. According to the filing, Deloitte refused to perform the necessary re-audit of these years because of "known errors" in the prior financial statements and "deficiencies" in CornerStone's supporting records. Adding to the deluge, the partnership disclosed that readjusting financial statements for prior periods would require correcting errors in "the

allocation of purchase price as it relates to certain acquisitions dating back to 1997" as well as propane tank rental accounting practices.

Lacking a re-audit of fiscal years 2000 and 2001, the Partnership could not obtain an audit of the fiscal year 2002 statements, other than the balance sheet, and was unable to file quarterly reports for periods in late 2002. Deloitte & Touche had refused to issue an opinion on the statements other than the balance sheet due to the absence and disarray of necessary financial records. In a Form 8–K filed on October 17, 2003, the Partnership described the contents of Deloitte's management letter regarding the partnership's fiscal 2002 balance sheet. The letter described failures in partnership accounting, internal controls on related party transactions, financial management, and centralization.

CornerStone filed its last Quarterly Report on Form 10–Q ("10–Q") for the quarter ending March 31, 2002. Since that time, it has failed to submit required filings with the SEC, and the SEC issued a "Wells notice" indicating that SEC staff recommended administrative proceedings against CornerStone to revoke registration of the partnership's common units.

Plaintiffs allege that beginning in July, 1998, the rosy picture publicly reported by individual defendants and CornerStone was knowingly false. Plaintiffs allege that defendants concealed negative business developments in order to keep the value of its common units buoyant and continue to fund acquisitions. Meanwhile, executives negotiated grossly inflated purchase prices for acquisitions in order to receive proportionately large bonuses through the Acquisition Incentive Plan. During the resulting "acquisition frenzy," plaintiffs allege that defendants improperly capitalized costs in violation of generally accepted accounting principles ("GAAP") and knowingly failed to write down the artificially-inflated value

of CornerStone's goodwill, enabling defendants to improperly increase EBITDA and report improperly inflated net income. In turn, by developing a fraudulent system of propping up CornerStone's net income and operating cash flows, defendants could avoid violations of debt covenants.

CornerStone and the individual defendants separately filed motions to dismiss the case on March 22, 2003, but CornerStone's intervening bankruptcy proceeding removed defendants' cases from this court's active calendar. On November 19, 2004, this court granted the individual defendants' unopposed motion for relief from the order removing this class action from the court's active calendar, and the present motion was rescheduled for hearing.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Because Rule 12(b)(6) focuses on the "sufficiency" of a claim rather than the claim's substantive merits, "[o]rdinarily, a court may look only at the face of the complaint to decide a motion to dismiss." *Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir.2002). Under Rule 12(b)(6), "unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief," a motion to dismiss must be denied. *Lewis v. Telephone Employees Credit Union,* 87 F.3d 1537, 1545 (9th Cir.1996) (citation omitted); *see also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") significantly altered pleading requirements in private securities litigation in order to eliminate meritless claims. *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 988 (9th Cir.1999). The statute requires that a se-

curities fraud complaint must plead both fraud and scienter, identifying (1) each statement alleged to have been misleading, (2) the reason or reasons why the statement is misleading, and, (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. *See* 15 U.S.C. § 78u–4(b)(1); *In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir.2002). Allegations are deemed to be held on information and belief, and thus subject to the particularity requirement, unless plaintiffs have personal knowledge of the facts. *In re The Vantive*, 283 F.3d at 1085, n. 3. A complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The Ninth Circuit has defined the requisite state of mind as "deliberate recklessness, at minimum," and requires plaintiffs to plead "particular facts giving rise to a strong inference" of that mental state. *See Silicon Graphics*, 183 F.3d at 974. "When determining whether plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (emphasis in original).

*DISCUSSION*

Invoking the PSLRA, as well as Federal Rules of Civil Procedure 8 and 12(b)(6), defendants have moved to dismiss plaintiffs' complaint. They argue that plaintiffs' 101–page complaint is a far cry from the "short and plain statement" required by Federal Rule of Civil Procedure 8. In addition, they argue that plaintiffs' claims amount to "fraud in hindsight," which fail to satisfy either the fraud or scienter components of the pleading requirements enumerated in 15 U.S.C. section 78u–4(b)(1). Lastly, the individual defendants argue

that plaintiff has failed to state a claim for control person liability under 15 U.S.C. section 78t. As a basis for evaluating these arguments, the court will first summarize the statements identified in the complaint.

### I. Statements Identified in the Complaint

Plaintiffs have listed dozens of CornerStone press releases, SEC filings, and analyst reviews as the backbone statements of their securities fraud claims. In addition, the complaint describes information provided by confidential witnesses regarding actions, statements, and omissions by defendants.

■ Under the incorporation by reference doctrine of the Ninth Circuit, this court is entitled to take documents on judicial notice which are referenced in but not attached to the complaint, as long as they are not subject to authenticity challenges. *See Fecht v. The Price Co.*, 70 F.3d 1078, 1080 n. 1 (9th Cir.1995) *cert. denied*, 517 U.S. 1136, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996). Such consideration does not convert the motion into one for summary judgment. *Id.* On that basis, this court has noticed those submissions by defendants of press releases and SEC filings specifically referenced in the complaint. *See Silicon Graphics*, 183 F.3d at 986. Plaintiff has not challenged the authenticity of any documents filed by defendant.

#### A. Press Releases

CornerStone press releases spanning the class period form a central component of plaintiffs' complaint. Read in chronological order, these press releases describe glowing financial health from the beginning of the class period in 1998 through May 3, 2001. At a sharp turning point, on July 29, 2001, negative disclosures began

to tumble forward, with bad news continuing through the end of the class period in February, 2003. The press releases cited in the complaint include the following arc of news from the company:

! July 29, 1998 and August 6, 1998 press releases trumpeted successful acquisitions which added millions of retail gallons of propane and thousands of customers, as well as EBITDA increases attributed to acquisitions. In August, the CEO thanked staff for "industry leading results" despite "very uncooperative weather." Compl. ¶ 130–31.

! November 4, 1998 press release asserted predictable losses due to the summer lapse in propane demand, but increased revenues compared to the same period the previous year. The partnership touted acquisitions and "industry leading growth pace," and the CEO stated that CornerStone is "on pace for a record year." *Id.* ¶ 136.

! February 3, 1999 press release described a fall in second quarter earnings due to warm weather, but stated that these lackluster results were offset by "higher gross profit margins." CEO Baxter stated that the partnership's growth continued to lead the industry and "positions us beautifully to take advantage of a return to more seasonal weather." *Id.* ¶ 141.

! May 3, 1999, August 4, 1999, November 2, 1999, February 2, 2000, May 3, 2000 press releases detailed significant increases in EBITDA and net income, attributing these to growth through acquisitions, margin management, and market share expansion of existing operations. Statements in May and August, 1999 announced successful and advantageous acquisitions during the quarters. *Id.* ¶¶ 145, 149, 155, 164.

! August 2, 2000 press release stated that CornerStone's EBITDA increased significantly, but lagged behind the same quarter in 1999. CEO Baxter ex-

plained these results as reflecting continued effects of warm weather and elevated product costs. He asserted that a financing program with CornerStone's banking syndicate, as well as existing debt and equity funding capabilities, "are expected to provide the partnership with adequate sources of capital to meet its operating needs through FY 2001." *Id.* ¶ 167.

! February 7, 2001 and May 2, 2001 press releases lauded healthy EBITDA and net income increases, results which CEO Baxter called "outstanding" and "a record achievement" which validated the company's business strategy. *Id.* ¶¶ 178, 182.

! July 27, 2001 press release delivered the first disclosure of bad news, stating that the partnership formed a committee to reduce its MQDs and "promptly address our increased overall level of debt." The press release attributed the changes to the coming expiration of bank credit agreements and the need for financial flexibility. *Id.* ¶ 186.

! November 5, 2001 and November 30, 2001 press releases announced improved retail EBITDA and a new credit facility. CEO Baxter stated that CornerStone should have sufficient capital, but "continue[s] to work to strengthen [its] balance sheet to gain further financial flexibility." *Id.* ¶ 197, 201.

! January 18, 2002 press release announced the Credit Suisse First Boston Corporation has been retained to "pursue strategic options, including the possible sale or merger of the partnership." *Id.* ¶ 202.

! February 6, 2002 and April 29, 2002 press releases announced smaller EBITDA than the prior year and a fall in CornerStone's Fitch rating. Both releases described adverse weather conditions. *Id.* ¶ 205, 209.

! July 31, 2002 and August 5, 2002 press releases announced that CornerStone elected to default on three classes of its Senior Notes, and that it continued to consider strategic options, including bankruptcy. *Id.* ¶ 108.

! August 6, 2002 and November 21, 2002 press releases revealed delisting from the New York Stock Exchange and the trading of CornerStone common units on the Pink Sheets. *Id.* ¶ 109.

Tracking the news from these press releases, CornerStone's common units experienced two precipitous falls over this period. Not surprisingly these two falls occurred immediately following the disclosures of July 29, 2001 and January 18, 2002. *Id.* ¶¶ 188, 203. Between Friday, July 27, 2001 and January 22, 2002, the value of the common units plummeted from $16.45 to $1.95 per share. *Id.*

### B. SEC Required Filings

The complaint catalogues nearly every Form 10–K, Form 8–K, and Form 10–Q filed by CornerStone during the class period. Many of these filings are cursorily alleged to contain "substantially the same" content as in immediately preceding partnership press releases. *See, e.g.,* Compl. ¶ 137, 141, 145, 151, 157, 161, 165, 169, 179, 184, 199, 207, and 211.

The only instances of independent allegations of misstatements of material fact refer to the following SEC filings:

! Form 10–K, year ending June 30, 1998, described high levels of revenue, gross profits, operating income, net income, EBITDA, and Partners' Capital. The filing touted centralization of operations and management. *Id.* ¶¶ 132–33.

! Form 10–Q, quarter ended September 30, 2000, described increases in EBITDA and gross profit. The filing also described the partnership's obligations under its Senior Notes Agreements and Bank Credit Agreement. It disclosed that the partnership was precluded from borrowing additional parity senior secured debt for acquisitions due to exceeding the incurrence test thresholds stated in the agreements, but was not impaired in its ability to make MQD payments. The filing also disclosed that CornerStone had refinanced a credit agreement in order to gain increased financial flexibility and granted North-Western a commitment fee in exchange for guaranteeing substantial partnership obligations. *Id.* ¶ 174.

! Form 10–Q, quarter ended December 31, 2000, announced the sale of Canadian crude oil activities. The filing contained the same disclosure regarding preclusion from borrowing additional parity senior secured debt, but again asserted ongoing ability to make MQD payments. *Id.* ¶ 179.

! Form 10–Q, quarter ended March 30, 2001, stated that despite restrictions from credit agreements, the partnership continued to meet ratios required for MQD payments. It also announced the terms and gains of the sale of Corner-Stone's Canadian crude oil activities. Id. ¶ 184.

! Form 10–K, year ending June 30, 2001, announced an increase in revenues but net losses for the year. The filing also stated that certain amounts in the 1999 and 2000 financial statements have been reclassified to conform to the 2001 presentation. Restatements of quarterly filings in late 2000 and early 2001 were attributed to a new SEC Staff Accounting Bulletin. The filing touted Corner-Stone's level of centralization. *Id.* ¶¶ 193–95.

! Form 8–K, filed February 11, 2003, states that Deloitte cannot re-audit CornerStone's previous filings. *Id.* ¶ 215.

As a whole, the picture of disclosures contained in the SEC filings mirrors those in the company's press releases.

### C. Analysts' Reports and Ratings

Plaintiffs have peppered the complaint with analyst reports, reviews, and ratings. *See, e.g.,* Compl. ¶¶ 142, 145, 160, 163, 168, 172, 173, 176, 177, 183, 189, 191. These reviews mirror the trajectory established by the press releases and SEC filings, showing favorable ratings from the beginning of the class period until the first release of negative news on July 27, 2001. *Id.* ¶ 189. The only contact between CornerStone executives and analysts allegedly occurred on May 3, 2001, when the complaint asserts that Baxter informed analysts that CornerStone was in its best financial health since the IPO, and on August 6, 2001, when management told analysts of concern over the partnership's leveraged position. *Id.* ¶ 182, 191. The complaint is silent on analysts' statements for the period following this turning point in CornerStone's financial picture.

In their opposition, plaintiffs assert that they are not pleading liability against defendants for materially false and misleading statements contained in analyst reports, nor, apparently, for actionable entanglement of defendants with analysts. Opp'n at 21, n. 25. Rather, they have simply included analysts' findings to "demonstrate the materiality of Defendants' representations to the investing public and the analysts' responses to those statements." *Id.*

### D. Confidential Witnesses' Corroboration

According to the complaint, plaintiffs' investigation of potential fraud at CornerStone revealed four confidential witnesses who "generally" corroborated plaintiffs' allegations. *See* Compl. ¶ 76. The first is a former financial analyst at Northwestern Growth ("FA1") who recounted falsification of Northwestern financial statements from 1997–99 and the shifting of ordinary expenses into the costs of acquisition. *Id.* ¶¶ 77–78, 80. A former senior financial analyst ("SFA1") at CornerStone from 2002–03 identified a lack of financial backing by NorthWestern and the need to smooth over price fluctuations with such financing. *Id.* ¶ 81.

Plaintiffs' third witness provided the most extensive and specific allegations of fraud. He is identified as a former vice president and controller ("VPC") at CornerStone and one of NorthWestern's subsidiaries for 14 years until November, 1998. *Id.* at ¶ 82–88. VPC stated that officers repeatedly instructed employees to perform fraudulent activities, that the size of NorthWestern's account with Andersen created a disincentive for the auditor to bring improper accounting practices to light, that an Andersen employee was removed from the CornerStone account for inquiring too much about questionable practices, and that CornerStone staff had no advanced accounting knowledge. *Id.* ¶¶ 83–85. VPC also described the specific character of CornerStone accounting fraud, including "significant manipulations" of financial data, "habitually under-reported costs," overlooked expenses, false records, the burying of business expenses as acquisition costs and inflated purchase prices on acquisitions. *Id.* ¶¶ 85–88. He believed that executive bonuses drove much of the misconduct. *Id.* at ¶ 88.

A property department employee ("PDE") at CornerStone and one of its acquired businesses is the final confidential witness, providing information suggesting defendants' lack of control over the counting and valuation of propane tank assets and intentional accounting manipulations. *Id.* ¶ 89. She described discrepancies resulting from improper controls over tank asset inventories at the time of acquisitions

of new businesses, as well as the failure to set aside reserves to cover such discrepancies. *Id.* ¶¶ 90–101. PDE also described that on at least one occasion she was given a slip of paper stating inflated values for propane tanks and other assets obtained through an acquisition, indicating that in her opinion, CornerStone had overpaid for the assets. *Id.* ¶ 102. PDE is the plaintiffs' primary source for a key allegation in the complaint that several of the individual defendants owned an entity formed at the time of CornerStone's creation from which the partnership subsequently purchased propane storage tanks at substantially inflated prices, though the actual tanks may never have existed. *Id.* ¶ 104.

## II. Compliance with the Federal Rules of Pleading

For obvious reasons, defendants have argued that plaintiffs' complaint is filled with repetitive, generalized allegations.[3] For nearly half of the complaint, in a section entitled "fraudulent scheme and course of business," plaintiffs catalogue nearly every press release, SEC filing, and major analyst's review for the class period. Alleged misstatements and falsehoods are organized in clusters apparently (but not necessarily sensibly) grouped by brief time frames. Each cluster is followed by an identical series of three or four of the plaintiffs' four principal allegations regarding acquisitions, accounting practices, centralization, and a related-party transaction. *See* Compl. ¶¶ 135, 138, 144, 148, 154, 158,

162, 166, 171, 175, 180, 185, 190, 196, 200, 204, 208, 213.[4] No specific statements carry their own allegations as to falsity, nor is there any identification of which aspect of each statement is alleged to have been false or misleading. Plaintiffs could have achieved an equivalent result by drafting the section as a laundry list of each statement claimed false, followed by the bases on which they contend the statement was false or misleading.

While the method of pleading in the present action is redundant, burdensome, and anything but concise, the issue before the court is whether it actually represents a violation of Federal Rule of Civil Procedure 8. The rule requires that plaintiff provide a "short and plain statement" describing why the plaintiff is "entitled to relief." Fed. R. Civ. Pro. 8. In the private securities litigation context, heightened pleading standards necessitate more detailed factual allegations. *See* Fed. R. Civ. Pro. 9(b); 15 U.S.C. § 78u–4(b)(1). Defendants argue that plaintiffs have violated Rule 8 by the lengthy, evasive format of the complaint and have also failed to satisfy the securities fraud pleading standards.

District courts in this Circuit have repeatedly chastised plaintiffs in securities fraud cases for the increasingly disfavored, "puzzle-style" pleading format used by plaintiffs in the present action. *See, e.g., In re Splash Technology Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1073 (N.D.Cal.2001); *Wenger v. Lumisys, Inc.* 2

---

3. Plaintiffs' complaint is organized as follows. After introducing the action and the parties, plaintiffs draw a "background to the fraud," which includes allegations regarding CornerStone's executive bonus plans, the general trajectory of the partnership's health, and the lack of internal controls on CornerStone's accounting practices. Plaintiff proceeds to lay out "defendant's fraudulent scheme," a cluster of allegations stemming from specific confidential informants. The section entitled "defendants' scheme unravels" documents

the emergence of information about accounting practices at CornerStone, including independent auditors' assessments of those practices and seemingly incriminating changes in accounting policies which resulted in massive downward adjustments in CornerStone's financial picture.

4. Each paragraph begins "The foregoing statements were false and misleading because..." followed by a recitation of the three or four stock, identical allegations.

F.Supp.2d 1231, 1244 (N.D.Cal.1998); *In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 991, n. 3 (D.Ariz.1999). The reasons for this impatience are well founded: the format provides no clear sense of the time line of defendants' alleged knowledge, nor particularized allegations as to the reasons for any given statement's alleged falsity. In this court's view, puzzle-style pleadings in securities cases abuse the principles of Rule 8 not because they are not short, which would run afoul of a concern expressed in this Circuit that Rule 9(b) and PSLRA pleading standards must not be placed on a collision course with Rule 8. *See In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1555 (9th Cir.1994) (Norris, J. concurring). Instead, puzzle-style pleadings clash with Rule 8 because they are not plain—their evasive, non-committal style significantly increases the burdens to both the defendants and the court in evaluating a complaint's satisfaction of the PSLRA pleading requirements.

■ While this court finds that the form of plaintiffs' allegations interfere with their satisfaction of the PSLRA requirements for pleading fraud and scienter, the complaint is not in violation of Rule 8. Instead, this court joins with another court in this district to "glean the complaint," declining the drastic step of dismissal based on the form of the pleading. *See In re Northpoint Communications Group, Inc.*, 184 F.Supp.2d 991, 998 (N.D.Cal.2001). Plaintiff has identified specific statements alleged to be false, as well as a broad investigation revealing facts suggestive of scienter, thereby serving the purpose of Rule 8 to put defendants on notice of the "true substance" of the claims against them. *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F.Supp.2d 1059, 1074 (N.D.Cal.2001); *In re Real Estate Assoc. Ltd. Partnership Litig.*, 223 F.Supp.2d 1142, 1146 (C.D.Cal. 2002). Where causes of action describe the alleged unlawful acts with sufficient particularity, delineate causes of action, and give defendants notice of the claims against them, they have satisfied the baseline requirements of Rule 8. *See In re Real Estate*, 223 F.Supp.2d at 1146; *Grid Systems Corp. v. Texas Instruments, Inc.*, 771 F.Supp. 1033, 1037 (N.D.Cal.1991).

Therefore, while issues of form will be discussed throughout this order as a basis for evaluating plaintiffs' satisfaction of securities fraud pleading requirements, the court finds that the complaint as written does not violate Rule 8.

### III. Actionable Misstatements or Omissions of Material Fact

■ The PSLRA requires courts to dismiss private securities fraud cases if they fail to allege either a false or misleading statement of material fact or an omission of material fact. 15 U.S.C. § 78u–4(b)(1), (b)(3). A complaint must specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Defendants argue that by listing statements without comment and applying four boilerplate allegations of falsity, the complaint fails to specify the reasons each statement is misleading or the facts on which the belief of that falsity is formed. Defendants also argue that many of the statements identified by plaintiffs—specifically the statements by third-party analysts and an individual defendant—are not actionable as pleaded in the current complaint.

### A. Adequacy of Plaintiffs' Allegations of Falsity

Plaintiffs in the present action cite a litany of statements from press releases, SEC filings, and analysts reviews, advanc-

ing four reasons that they were false and misleading when made. Firstly, plaintiffs contend that defendants' optimistic growth reports and SEC filings throughout the class period were false because defendants had overpaid for every acquisition between 1997–2000, causing CornerStone to book excessive goodwill in violation of GAAP. *See, e.g.,* Compl. ¶ 135(a). Secondly, plaintiffs base their theory of falsity on information that defendants had instructed their accounting staffs to improperly capitalize operating expenses, and thus they knew that the EBITDA and reported net income were materially overstated. *See, e.g., id.* ¶ 135(b). Thirdly, plaintiffs allege that defendants falsely touted highly centralized management and operations, but in fact operated a highly decentralized internal reporting process. *See, e.g., id.* ¶ 135(c). Fourthly, plaintiffs allege that defendants violated the GAAP rule governing "related party transactions" by failing to disclose that Baxter, Kittrell, and Goedde, under the auspices of another entity created at the time of CornerStone's formation, owned a set of storage tanks which were leased and later sold to CornerStone at excessive rates. *See, e.g., id.* ¶ 135(d). The basis for each of these theories of securities liability is that defendants' press releases and SEC filings throughout the class period were false and misleading because they relied on numbers derived from intentional accounting manipulation and deceptive management. *See, e.g., id.* ¶ 216. The court will consider the adequacy of each claim of falsity in turn.

### 1. Misrepresentations of CornerStone's Growth Strategy

 Plaintiffs contend that defendants' press releases and SEC filings trumpet-

ing the success of the partnership's growth strategy were knowingly false. *See, e.g., id.* ¶¶ 130, 131, 136, 141, 155, 159, 164. They allege that in fact, CornerStone's growth strategy was to be the partnership's demise, because defendants had overpaid for every acquisition between 1997–2000 and caused CornerStone to book non-recoverable goodwill for these acquisitions. *See, e.g., id.* ¶ 135(a). These inflated acquisition purchase prices allegedly led to significant and predictable write-downs of the partnership's goodwill. The complaint identifies several corroborating details for this allegation: (1) confidential witness VPC's statement that CornerStone was overpaying for all acquisitions, (2) VPC's particular example of the Placerville acquisition, allegedly overvalued on the books by 100%, (3) the partnership's decision to write down CornerStone's goodwill by $174 million, and (4) the partnership's decision to restate its financial statements for the fiscal years 2000 and 2001.[5] *See id.* ¶¶ 85–88, 112, 123.

Plaintiffs' allegations of falsity with respect to defendants' growth strategy are inadequate as currently pled. As to VPC's corroborating information, this court has no basis on which to infer the accuracy of his knowledge of the actual or stated value of the partnership's acquisitions, much less their methods of accounting for these acquisitions. The complaint fails to allege any information on his job responsibilities or access to acquisitions information other than his position title. *See* Compl. ¶ 83; *Wietschner v. Monterey Pasta Co.,* 294 F.Supp.2d 1102, 1112 (N.D.Cal.2003). Furthermore, as both defendants point out, VPC's access to any information about

---

**5.** However, it is indicative of the general failures of both the complaint and the plaintiffs' opposition that nowhere did plaintiffs argue these corroborating details as a basis for the

allegations of false financials. Instead, plaintiffs have relied on this court to piece together the allegedly false statements with the plaintiffs' allegations of accounting misconduct.

CornerStone's acquisitions or financial data ceased a mere four months into the class period. This requires the court to draw two conclusions: either he is referring to nonactionable acquisitions which occurred prior to the class period, or he is referring to acquisitions during the period spanning July 29, 1998 through November, 1998. As the complaint alleges only 11 acquisitions total during the 1998 year, which presumably could not all have occurred during a four month period, the authority of VPC's assertions to cast doubt on all of CornerStone's acquisitions and thus the success of the growth strategy generally is diminished.

Defendants argue that this issue of fraudulent overpayment is inadequately pleaded, as the complaint fails to specifically identify which acquisitions were overpriced, how much was paid for these acquisitions in comparison to actual value, how the plaintiffs know of the overvaluation of the acquisitions, and how much goodwill should actually have been booked. Given the factual complexity of such information and the large number of acquisitions during the class period (43), this level of specificity would be more onerous than required by the "particularity" standard of the PSLRA. *See id.* ¶ 52. The overall point is correct, however, that plaintiffs must substantiate, with particularity, the reasons for their information and belief that CornerStone's acquisitions were overvalued and some estimation of the overall accounting consequences of those valuations. *See In re Vantive,* 283 F.3d at 1091 (plaintiffs must allege the amounts by which sums are overstated in an accounting fraud allegation).

The fact that CornerStone was later forced to substantially write down its goodwill, as well as reissue its financial statements for fiscal years 2000 and 2001, certainly reveals that the company's financial results during that time period contained inaccuracies when made. Yet the complaint lacks any allegation that would extend that falsity further back in time, encompassing the acquisitions made between July 29, 1998 and the end of the 1999 fiscal year on June 30, 1999. Two years of acquisitions thus go unaccounted for. While VPC's allegations, if amended to clarify the basis for his knowledge, fill the gap for some of this time period, the basis for inferring the falsity of each of CornerStone's claims of an advantageous and successful growth strategy must be clarified. And this basis, of course, must be distinct from mere postulations on more sustainable and effective systems for mitigating the risks caused by the company's weather sensitivity. Plaintiffs must allege with particularity that for the class period running through the company's economic downturn in July 27, 2002, CornerStone's reported financial picture concealed the known defect of artificially-inflated goodwill based on overpriced and misallocated acquisitions. By casting their allegation so broadly—that all statements regarding CornerStone's growth plan were false—plaintiffs have raised their own pleading burden immensely.

### 2. Misrepresentations about Financial Results

■ Plaintiffs also allege that CornerStone falsely reported increases in its EBIDTA over the class period. *See, e.g.,* Compl. ¶ 145, 147, 149, 155, 157, 159. Plaintiffs' theory of falsity is that CornerStone's EBITDA was intentionally and artificially inflated, because defendants had instructed CornerStone accounting staff to improperly capitalize operating expenses. *See, e.g., id.* ¶ 135(b).

Although plaintiffs fail to make the point in their opposition, the complaint contains several allegations which arguably corroborate the allegation that CornerStone's EBITDA was knowingly overstated. First

of all, one of the plaintiffs' confidential witnesses, FA1, reported the shifting of ordinary expenses into acquisition costs at NorthWestern Growth, a division of CornerStone's parent company NorthWestern Corporation. *Id.* ¶¶ 77–78. While FA1 provides important insight into how such fraudulent accounting can be performed, as pleaded it is not information on which plaintiffs can rest allegations against CornerStone. Defendants are correct that as currently pleaded, FA1 cannot levy charges of similar conduct against CornerStone, and this court has no basis for inferring that accounting practices at NorthWestern were transferred to CornerStone, for instance by the movement of key staff between the companies or united management of their relevant accounting processes.

Secondly, the information provided by VPC corroborates that CornerStone commonly buried operating expenses through capitalization and expected amortization over time. *See id.* ¶ 86–87. VPC described a conference call in which Goedde, an individual defendant in the present action, instructed a named employee in the method for capitalizing $4.5 million in expenses and thus inflating fiscal year 1998 earnings. *Id.* As VPC personally participated in this conference call, his basis for knowledge is adequately alleged, and on this basis plaintiffs have pleaded with particularity the basis of their belief that the financial reports for 1998 were misstated. VPC's allegations regarding the acquisition of Continental Propane similarly corroborate the allegations of misallocation on the balance sheet in 1998, though in this case VPC's basis for information was not spelled out. *Id.* ¶ 87.

PDE, an employee of CornerStone throughout the class period, provided testimony which also corroborated the overstatement of asset values by CornerStone management. *Id.* ¶ 101–102. However, as described above, to satisfy the pleading requirements of the PSLRA, plaintiffs must assert the basis of PDE's knowledge, beyond the simple description that she was a property department employee. *Id.* ¶ 89. If the allegations of PDE's basis of knowledge are substantiated, her description of a process by which she was instructed by superiors to record above-market rate values for assets acquired during acquisitions sufficiently supports plaintiffs' belief that CornerStone's EBITDA was kept elevated by manipulation of partnership expenses. *Id.* ¶ 102.

Adding to the allegations provided by confidential witnesses, Deloitte's management letter issued in conjunction with its audit of the partnership's fiscal 2002 balance sheet articulated several of the accounting failures explained by the confidential witnesses' testimony. The letter criticized the partnership for the failure to properly review, monitor, and maintain general ledger accounts, to verify approval and recording of "non-systematic journal entries," and to ensure methodologies used to calculate estimates in financial statements were "consistent and reasonable." *Id.* ¶ 127.

Plaintiffs must allege the foundations of their confidential witnesses' knowledge and the reasons that particular financial statements throughout the period were allegedly false. The Deloitte management letter and the single conference call between VPC and CornerStone were adequately pleaded as written, but alone they cannot substantiate an allegation that all financial results for the class period were false.

### 3. Misrepresentations Based on Cornerstone's Level of Centralization

■ In yearly financial disclosures from 1998–2001, defendants asserted a highly-centralized management and operations process, with strong computer network

links between CornerStone's service centers and its corporate headquarters, a centralized propane purchasing system, and centralized management functions. *See, e.g., id.* ¶¶ 66, 133, 153, 170, 195. The complaint alleges that through its auditors, defendants were aware of problematic levels of decentralization at CornerStone, rendering these yearly reports misleading. *See, e.g., id.* ¶¶ 135, 154, 171, 196. In October of 2003, CornerStone disclosed that Deloitte & Touche had described the company's reporting process as "highly decentralized" and described a "failure to centralize" that process. *See id.* ¶ 127. The complaint also alleges that audits by Andersen had revealed similar weaknesses, though the complaint provides no specifics as to when and how these criticisms were conveyed to defendants. *See, e.g., id.* ¶¶ 135, 154, 171, 196.

Greater clarity is required to determine whether the auditors' comments in fact render CornerStone's heralding of its centralization levels to be false and misleading. Defendants argue that the company's yearly disclosures focus on the centralization advantages offered by the computer network, propane purchasing, and basic management functions, assertions which are not necessarily contradicted by a decentralization critique of "reporting processes" by the auditors. Defs' Mot. at 18. Indeed, the two allegations can be read as both true and correct, as the complaint gives this court no basis for assuming that the "reporting processes" ambiguously referred to by the auditors are components of the centralized accounting and other management functions touted in the yearly reports. Furthermore, without evidence of the time frame in which auditors began flagging centralization problems to CornerStone management, there is no basis for this court to infer that defendants were lying when they trumpeted their commencement of centralized computing and management processes.

Therefore, as currently written, the complaint does not adequately "state with particularity all facts on which that belief [of an untrue material fact or misleading omission] is formed" with respect to claims about CornerStone's centralized management. 15 U.S.C. § 78u–4(b)(1)(B). As pleaded, plaintiffs have failed to state a claim of false or misleading statements on this issue.

### 4. Omission of a Related Party Transaction

■ In a management letter issued in connection with its audit of the partnership's fiscal 2002 balance sheet, Deloitte described CornerStone's failure "to implement internal controls to ensure related party transactions are appropriately recorded and disclosed in its external financial reporting." Compl. ¶ 127. Plaintiffs have specifically alleged one such related-party transaction. Confidential witness PDE described that CornerStone leased propane storage tanks at substantially inflated prices from an entity known as LQA1, which was created by Baxter, Kittrell, and Goedde at the time of CornerStone's formation. *Id.* ¶ 104. In essence plaintiffs argue that because this transaction occurred before the class period, every subsequent press release and SEC filing actionably omitted the material fact of LQA1 and other related party transactions. The issue is thus whether the combination of the disclosed management letter and PDE's statements are sufficient to allege that defendants committed misleading omissions by failing to disclose CornerStone's relationship to LQA1.

Defendants argue that the Statement of Financial Accounting Standards only requires disclosures of "material" related party transactions, and that plaintiffs' failure to allege materiality, and establish a basis for that allegation, is fatal to their

claim on this issue. Defs' Mot. at 19. This court may infer or deduce the allegation of materiality from the complaint, as the pleading describes a large number of high volume propane tanks owned by top CornerStone executives which were leased and sold to the company at "substantial premium[s]" that were "far above their market value." *See, e.g.*, Compl. ¶¶ 104(a); 135(d). It would be premature for this court to evaluate the actual materiality of defendants' omissions, because the materiality of an omission is a question reserved for a jury unless "reasonable minds could not differ" on the adequacy of the disclosure and the question is appropriate for resolution as a matter of law. *See In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir.1996), *cert denied,* 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). Clearly this latter exception does not apply in the present case, where the court does not have sufficient facts in the complaint to assess materiality under the Statement of Financial Accounting Standards as a matter of law, nor was plaintiff required to allege such specific facts in order to state a claim.

Defendants also argue that plaintiffs fail to allege that Baxter, Kittrell, and Goedde did not disclose LQA1 to the partnership's auditors. *Id.* This issue is addressed by allegations regarding Deloitte's management letter, which demonstrates that disclosure of such transactions to auditors was inadequate to satisfy disclosure standards. The letter expressed the auditors' findings that "external" reporting of related party transactions was not taking place as required. *See id.* ¶ 127.

Without pleading PDE's basis of knowledge, the complaint has not yet substantiated the allegation regarding the LQA1 entity. The allegation of a material omission regarding related-party transactions for the entire 1998–2003 period thus exclusively rests on a Deloitte management letter disclosed in late 2003. This allegation alone cannot carry the weight of alleging material omissions for the preceding five-year class period. Therefore, as written, the complaint does not adequately "state with particularity all facts on which that belief [of an untrue material fact or misleading omission] is formed" with respect to the individual defendants' failure to disclose a material related party transaction. *See* 15 U.S.C. § 78u–4(b)(1)(B).

### B. Non–Actionable Statements

Defendants argue that two sets of statements alleged by plaintiffs cannot serve as a basis for securities fraud liability. First, they argue that comments made by CornerStone's former Chief Executive Officer, Keith Baxter, in press releases and on SEC filings, amounted to mere "puffing." Second, they argue that plaintiffs have failed to allege actionable statements by the third-party analysts cited extensively in the complaint.

### 1. Baxter's Comments

Plaintiffs' catalogue of press releases and SEC filings quotes a number of comments made by Keith Baxter, CornerStone's former CEO, regarding CornerStone's successful growth, management, EBITDA, and gross profit margins.[6] The

---

**6.** *See, e.g.,* Compl. ¶¶ 131, 136 (describing "industry leading" growth and results); ¶ 141 (stating that he was "encouraged by the Partnership's management" and that CornerStone's aggressive growth "positions us beautifully to take advantage of a return to more seasonal weather"); ¶ 159 (stating that "I am very pleased with the accomplishments we

have achieved" and describing "measurable progress" through growth); ¶ 164 (attributing "accomplishments" in the face of warm weather to "continuing improvements" in operations and "increased cash flows from acquisitions and internal growth"); ¶ 167 (expressing pride in the company's "year over year improvement in EBITDA" and justifying

first issue raised by defendants is whether such comments amount simply to non-actionable "puffing" and corporate optimism, or forward-looking statements protected by the safe harbor rule. Defs' Mot. at 11–13.

■ "[V]ague, generalized, and unspecific assertions" of corporate optimism or statements of "mere puffing" cannot state actionable material misstatements of fact under federal securities laws. *See Glen Holly Entertainment, Inc. v. Tektronix. Inc.*, 352 F.3d 367, 379 (9th Cir.2003); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir.1997); *City of Monroe Employees Retirement Sys. v. Bridgestone Corp.*, 387 F.3d 468, 489 (6th Cir.2004); *Rombach v. Chang*, 355 F.3d 164, 174 (2nd Cir.2004). Generally, such statements consist of forward-looking or generalized statements of optimism that are "not capable of objective verification," and "lack[ ] a standard against which a reasonable investor could expect them to be pegged." *See Grossman*, 120 F.3d at 1119; *Bridgestone*, 387 F.3d at 489. Statements that fall within the rule tend to use terms that are not measurable and not tethered to facts that "a reasonable person would deem important to a securities investment decision." *Bridgestone*, 387 F.3d at 489. Interpretation of the "mere puffery" rule has distinguished cases of "definitive positive projections" from statements projecting "excellent results," a "blowout winner" product, "significant sales gains," and "10% to 30% growth rate over the next

several years." *See Grossman*, 120 F.3d at 1119.

The puffery rule does have an outer boundary, however. The Ninth Circuit has defined the point at which a projection of optimism becomes an actionable, "factual" misstatement under section 10(b), namely, when "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *See Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir.1994).

■ The issue is thus whether Baxter was simply puffing or in fact reasonably believed his own statements. On this first question, it is clear that most of the comments cited in the complaint were projections of general optimism, amounting to nothing more than a parade of rosy adjectives—unmoored to any objective measures—combined with general reiterations of the pursuit of CornerStone's growth strategy. His claims of "industry leading" growth, growth that "positions us beautifully," "measurable progress," "continuing improvements," "accomplishments we have achieved," expressions of pride in CornerStone staff, "outstanding retail results," and other similar comments all constitute vague, unspecific assertions of corporate optimism. *See* Compl. ¶¶ 131, 136, 141, 159, 164; *Tektronix, Inc.*, 352 F.3d at 379. Baxter's statements addressing CornerStone's expected resilience in the face of mounting debt similarly qualify as his

some slippage in the quarter's EBITDA on the basis of weather); ¶ 178 (touting an increased EBITDA as "outstanding results for the quarter" and "a record achievement" which "validate[d]" the partnership's "strategic themes"); ¶ 181 (describing "outstanding retail results" and describing the partnership's business strategy). In addition to these more optimistic assessments, the complaint lists Baxter's comments as CornerStone's financial

picture begins to downslide. *See* Compl. ¶ 186 (announcing a reconsideration of the company's business strategy to address the "overall level of debt"); ¶ 201 (stating that a new credit facility should give CornerStone adequate capital to meet its needs); ¶ 206 (attributing a decrease in EBITDA to weather and describing the company's plans to control costs and maximize margins).

opinion, or spin, on the partnership's potential to survive its financial slide. *See id.* ¶¶ 186, 201, 206. These too are a form of puffery—the kind of booster confidence any reasonable investor would expect from a CEO. *See Bridgestone,* 387 F.3d at 488 (noting that "reasonable investors expect corporate managers to be confident about their stewardship").

■■■ Some of Baxter's comments are tethered by more objective measures of performance and recovery. *See id.* ¶¶ 164, 167, 178, 201 (statements which describe actual EBITDA, cash flows, and capital needs). However, plaintiffs have not alleged particularized grounds for disbelieving Baxter's belief in what he was asserting, nor for questioning the reasonableness of those projections based on information available to Baxter. *See Kaplan,* 49 F.3d at 1375. Plaintiffs' general assumption that Baxter must have been aware of the accounting practices used at his own company, the unsustainability of the acquisitions program given CornerStone's accounting methods, and other factors tending to jeopardize the meaningfulness of the company's positive results are not sufficiently particularized bases on which to hang liability for the falsity of specific statements. The complaint lacks particularized allegations that at the time Baxter made each allegedly actionable statement, he was either lying or in possession of contradictory information that would undermine his projections.

Here again, the complaint's failure to pair statements with specific bases of falsity impairs the pleading. Unlike the case cited by plaintiffs, the present complaint lacks an allegation of a specific document, source of information, or other undisclosed fact that would undermine Baxter's belief in the projections. *See Nursing Home Pension Fund v. Oracle Corp.,* 242 F.Supp.2d 671, 679–80 (finding statement of glowing optimism actionable because of

an allegation that "internal reports" documented the inability of the defendant company to meet its earnings projections). The complaint in the present action does not allege that Andersen or Deloitte issued management letters or other critiques of company accounting to Baxter prior to any of his alleged statements. Nor does the complaint allege that Baxter was involved in any of the fraudulent transactions described by the confidential informants. On the other hand, repeated rosy statements may exceed puffery where they are made in the face of clearly contrary facts. The "dumb CEO defense", after all, *might* be a "defense", if anything, albeit a not very respectable one. At this state, however, plaintiffs need to tie their allegations of Baxter's false statements to what Baxter knew or was deliberately reckless in not knowing.

Therefore, plaintiffs have not alleged any statements by CornerStone's CEO which constitute actionable bases for securities liability.

*2. Analysts' Ratings and Projections*

Plaintiffs also repeatedly cite analysts' favorable reviews and ratings of CornerStone common units throughout most of the class period as false and misleading statements. *See, e.g.,* Compl. ¶¶ 142, 145, 160, 163, 168, 172, 173, 176, 177, 183, 189, 191. Defendants argue that these statements are not actionable, because plaintiffs failed to allege that the individual defendants or CornerStone adopted or were otherwise responsible for the statements. Defs' Mot. at 13. Contrary to the construction of the complaint, plaintiffs assert in their opposition that references to these comments are meant simply to "demonstrate the materiality of Defendants' representations to the investing public and the analysts' responses to those statements,"

and are not asserted as a basis for liability. *See* Opp'n at 21, n. 25.

These allegations will be treated solely for that purpose and if left in any amended complaint, the complaint should make clear that they are not alleged as the gravamen of the false and misleading charges and the court will not so construe them.

### IV. Failure to Plead Scienter with Particularity

■ In addition to sufficiently alleging fraud, federal securities complaints must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The Supreme Court has defined scienter as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Plaintiffs must plead "particular facts giving rise to a strong inference of deliberate recklessness, at minimum" in order to satisfy the PSLRA's heightened pleading standards for scienter. *See Silicon Graphics,* 183 F.3d at 974. The particularity requirement of this standard requires a plaintiff to "provide a list of all relevant circumstances in great detail." *Id.* at 984. While each allegation of scienter must be analyzed, courts also have the duty to consider the complaint collectively, inquiring "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Broudo v. Dura Pharms.,* 339 F.3d 933, 940 (9th Cir.2003).

In their opposition to defendants' motion, plaintiffs argue that they have adequately pleaded scienter based on their allegations of the confidential witnesses' information, the magnitude and severity of GAAP and SEC violations, the motive and opportunity created by the incentive bonus programs, and the termination of individual defendants. The court will consider each of these bases for identifying scienter in turn, considering defendants' arguments for the inadequacy of each set of allegations. As scienter must be analyzed based on the totality of allegations provided in the complaint, disposition of the issue will be reserved until this section's conclusion. *See Gompper,* 298 F.3d at 897.

### A. Scienter Alleged by Confidential Witnesses

■ Information gained from confidential witnesses forms a significant source for plaintiffs' allegations of fraud and misconduct at CornerStone. *See* Compl. ¶¶ 76–105. Plaintiffs argue that these confidential sources provide testimony that individual defendants' acts, which are imputed to CornerStone through the executive's signatures on SEC filings, amounted to "conscious misbehavior or recklessness." Opp'n at 7. Defendants argue that comments from confidential sources do not provide a basis for inferring scienter because they are overly generalized and tangential to plaintiffs' claims. Defs' Rep. at 14–16.

Subject to the aforementioned concerns about her basis of knowledge, plaintiffs' witness PDE is an important source of allegations regarding defendants' knowledge and orchestration of accounting misconduct. She described defendants' receipt of internal audit reports demonstrating that the number of propane tanks held by CornerStone was dramatically overstated, and yet defendants failed to write-down the tank assets held by any of the CornerStone service centers. Compl. ¶ 97. PDE also described an undisclosed number of transactions in which she was given a piece of paper with a number on it which was to be recorded as the value of assets booked

during an acquisition. *Id.* ¶ 102. She alleged that these numbers were impossibly high, for instance, higher than the replacement value to purchase the assets new, and that "everyone knew" that the goodwill booked was too high and that CornerStone was overpaying for the company. *Id.* To satisfy the particularity standard, plaintiffs must plead more. The complaint lacks PDE's basis of knowledge about the propane tank asset reports, defendants receipt of these reports, and other corroborating facts that the tank assets were not written down in response to these reports. Plaintiffs must allege particulars of the transactions recording inflated numbers—how often they occurred, who passed her the slip of paper with inflated figures, how she knew the figures were inflated, who else knew about the inflation of goodwill and how they knew it, and so forth.

The groundwork for scienter is also laid by confidential witness VPC. Plaintiffs allege that via a conference call including VPC, Goedde instructed an employee in capitalizing current expenses as propane tank costs, and later instructed that same employee in a specific transaction to create a false record to remove $4.5 million as an expense item for the year ending June 30, 1998 (importantly, a date preceding the class period) and instead capitalize it to the balance sheet specifically to inflate earnings for the year ending June, 1998. *Id.* at ¶ 86. As above, these allegations lack a foundation for his basis of knowledge, and his authority is of time-limited utility due to his departure from CornerStone early in the class period.

Other than the allegation described, VPC does not actually allege with particularity any knowledge or "deliberate recklessness" on the part of CornerStone executives. Instead, his allegations state merely that NorthWestern used the scale of its account with Anderson to persuade the auditors to overlook questions about CornerStone's accounting practices, and to overlook any questionable accounting failures therein. *Id.* ¶ 85. VPC does not allege that Andersen posed these questions of CornerStone control persons, nor that they raised specific accounting concerns with those persons. Other than the conclusory statements that "Nye knew of all the wrongdoing but essentially did what he was told" and "Goedde, Baxter, and Kittrell orchestrated the manipulation of CornerStone's books in concert with Hylland, Newell and Lewis," the complaint includes no particulars as to how the "defendants acted with deliberate or conscious recklessness." *Broudo,* 339 F.3d at 940; Compl. ¶ 85. Another conclusory statement "[VPC's] admonitions against these practices notwithstanding," also fails to provide adequate particulars such as what admonitions VPC voiced and when and to whom he voiced them. *See id.* If plaintiffs do possess answers to these questions, they must be pled, providing necessary particulars on which they base their information and belief of scienter.

### B. Scienter Alleged by Pervasive GAAP Violations

Though not evident from their complaint, plaintiffs state in their opposition that the pervasiveness of alleged violations of GAAP and SEC rules raise a strong inference of scienter. Opp'n at 10–12. In particular, plaintiffs argue that the failure to file with the SEC (presumably a result of the accounting improprieties), restate financial statements for prior inaccuracies, and re-audit fiscal years 2000 and 2001, as well as the need to write down $174 million in goodwill, all indicate egregiously high levels of accounting disarray and disregard for truthful accounting. Opp'n at 11. This level of disarray and reckless neglect of internal controls, plaintiffs argue, is corroborated by the confidential witnesses cit-

ed in the complaint. *Id.* Defendants argue that without a showing of fraudulent intent, allegations of GAAP or SEC rules violations do not establish a strong inference of scienter. Defs' Rep. at 5.

██ The majority of circuits have clearly held that standing alone, allegations of violations of GAAP or SEC regulations do not establish scienter. *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir.1994); *Adams v. Kinder–Morgan, Inc.,* 340 F.3d 1083, 1106 (10th Cir.2003); *Kushner v. Beverly Enterprises, Inc.,* 317 F.3d 820, 831 (8th Cir.2003); *Fidel v. Farley,* 392 F.3d 220, 231 (6th Cir.2004). *See also In re Cabletron Sys., Inc.,* 311 F.3d 11, 39 (1st Cir.2002) (holding that allegations of "accounting shenanigans" and intentional GAAP violations may augment a showing of motive and opportunity to adequately plead scienter). This rule is underpinned by the strong mandate in the PSLRA to avoid speculation, conjecture, and hindsight. *Fidel,* 392 F.3d at 231. *See also Silicon,* 183 F.3d at 989 ("Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight' "). However, where the allegations of pervasive GAAP violations are accompanied by "other particularized facts" giving rise to an inference that the defendant intended to deceive by reporting false financial data. *See Kinder–Morgan, Inc.,* 340 F.3d at 1106. In order to distinguish "deliberate recklessness" from "ordinary carelessness," allegations of GAAP violations must be augmented by "facts that shed light on the mental state" of defendants, rather than conclusory allegations that defendant must have known of the accounting failures due to the degree of departure from established accounting principles. *See DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390–91 (9th Cir.2002).

Allegations of GAAP violations thus provide some measure of support for the present plaintiffs' ultimate allegation of scienter, but they must be underpinned by other particularized allegations that defendants possessed the requisite mental state.

### C. Scienter Alleged by Motive and Opportunity

██ Defendants' motive and opportunity to falsely account for acquisitions is repeatedly referenced in the complaint, and plaintiffs argue that these allegations provide a third basis for finding that scienter is adequately pled. *See, e.g.,* Compl. ¶¶ 4, 17–20, 29, 45, 51, 53–54, 88; Opp'n at 12–13. Motive and opportunity are relevant to establishing scienter, though scienter cannot rest on those allegations alone. The Ninth Circuit has clearly held that incentives to enhance business prospects and executive compensation incentives are insufficient allegations of scienter. *See Silicon Graphics,* 183 F.3d at 974 (holding that facts which indicate "a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, [but] they are not sufficient to establish a strong inference of deliberate recklessness"); *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1038 (9th Cir.2002) (holding that general allegations of motive, without more, are insufficient to establish scienter). Rather, facts must come closer to demonstrating intent. *Id.* Compensation plans which reward executives for performance similarly should not serve as a basis for allegations of fraud. *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir.1994) (holding that "[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations.")

██ Plaintiffs' theory of the case relies in large part on the allegedly perverse

incentives created by the combination of the Acquisition Incentive Plan and the Annual Operating Performance Incentive Plan, which tied executive bonuses to the gross acquisition purchase price, under the first plan, and to the budgeted levels of net income and EBITDA, under the second plan. To take advantage of both of these bonus programs, executives had the motive and, by virtue of their control positions, the opportunity, to purchase acquisitions at inflated prices while developing a method of accounting gymnastics to keep EBITDA artificially high. *See Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1130 (2nd Cir.1994) (defining motive as "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures" and opportunity as "the means and likely prospect of achieving concrete benefits by the means alleged"). However, it is also true that the programs served CornerStone's business strategy of mitigating the risk of mild weather through an increase in market share and margins, and plaintiffs allege no failures to disclose any aspects of the incentive programs.

Defendants have not directed this court to any programs which similarly incentivized the specific form of accounting malfeasance alleged by the complaint, but rather to numerous cases refusing to find scienter based on executives' general motives to keep their high positions, increase the value of their stock holdings, and ensure overall profitability for the company as a means to increase one's own income. *See, e.g., Silicon Graphics*, 183 F.3d at 980 (holding that the allegation of motive and opportunity to inflate the value of company stock while engaging in insider trading, taken alone, was insufficient to plead securities fraud); *Lipton*, 284 F.3d at 1038 (holding that the motive to achieve favorable line of credit was a non-actionable routine business objective); *In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982,

998–99 (D.Ariz.1999) (holding that the value of personal stock holdings, business success, and long-term incentives linked to company financial performance were an insufficient basis for alleging scienter). While these cases are similar to the present action, they do not involve programs which specifically and directly tied executive bonuses to the very instrument used to commit the alleged fraud. Yet they soundly reiterate the proposition that a pleading must make allegations of greater particularity that demonstrate knowledge and incentive to commit fraud.

Therefore, plaintiffs' allegations about individual defendants' incentives squarely contribute to a strong inference of scienter, however they are legally and factually insufficient to carry that burden alone.

### D. *Scienter Alleged Based on Executive Terminations*

Lastly, plaintiffs argue that the fact that individual defendants were terminated by CornerStone provides an important indicator of scienter. *See* Compl. ¶ 6; Opp'n at 14. In their replies, defendants respond that there is no factual basis for the allegation that Baxter, Kittrell, and Nye were terminated, and that in any event, management changes are expected after restatements and other adverse business events. Defs' Rep. at 12–13. Individual defendants overstate the factual basis for their argument that CornerStone's public statements contradict the allegation that the chief officers were fired, as in fact, defendants' own submissions to this court document the departures of Baxter, Kittrell, and Nye, subject only to the caveat that they would assist in the "management transition." Manning Supp. Dec., Exh. QQ–RR. Plaintiffs argue that this court should apply *In re McKesson* for the proposition that firing employees in conjunction with restatement of financials constitutes

evidence of fraud. *In re McKesson,* 126 F.Supp.2d 1248, 1274 (N.D.Cal.2000). However, in that case, the officials were terminated on the publically-stated grounds that they "should have known, or did know, of the accounting problems." *Id.* In the present action, by contrast, there is no evidence that defendants' termination was based on fraud.

The court finds that whether they were terminated or resigned, these notable departures are not in and of themselves evidence of scienter. Most major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions.

### E. Insider Stock Sale as a Basis for Scienter

Based on their readings of the complaint, defendants identified an additional ground upon which they believe that plaintiffs claim scienter. The individual defendants argue that plaintiffs' allegations of defendant Goedde's large stock sale as a CornerStone insider would be an inadequate basis for scienter, and that in fact, due to his status as the only alleged inside trader, can be read to work against plaintiffs' allegations of systematic management deception.[7] Defs' Mot. at 21. However, this theory of scienter was not advanced by plaintiff in either the complaint or the opposition to the present motion, and thus plaintiffs are evidently not alleging this unit sale facts as a basis for inferring

defendants' state of mind and the court will not so construe it.

### F. Totality of Plaintiffs' Allegations of Scienter

■ A court's ultimate analysis of scienter must be conducted based on the totality of allegations and inferences in the complaint. *Gompper,* 298 F.3d at 897. To satisfy the Ninth Circuit's interpretation of the PSLRA, plaintiffs' allegations must give rise to a strong inference of deliberate recklessness, "provid[ing] a list of all relevant circumstances in great detail." *See Silicon Graphics,* 183 F.3d at 974. The complaint in the present action contains many raw ingredients which arguably together raise an inference of scienter, if not a strong inference. Yet, by failing to provide any allegations of time frames by which defendants knew of facts that would undermine the truth of their public disclosures, plaintiffs have not alleged that defendants possessed the requisite mental state. As currently written, the complaint fails the particularity requirement, lacking clear allegations establishing who knew what and when. It fails the standard of scienter established in *In re Vantive* and applied by this court on subsequent occasions: to "allege contemporaneous facts in sufficient detail and in a manner that would create a strong inference that the alleged adverse facts were known at the time of the challenged statements." *See*

7. The case law is clear that were plaintiffs to assert Goedde's stock sale as a basis for inferring scienter, they would be required to show that such sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed insider information." *Silicon,* 183 F.3d at 986. Identifying "unusual or suspicious" stock sales turns on (1) the quantity of shares sold by insiders, (2) the timing of the sales, and (3) whether the sales were consistent with the insider's prior trading history. *Id.* Were plaintiffs to argue Goedde's

stock sales as a basis for inferring scienter they could not succeed on the present complaint, as there is no way of evaluating the significance of Geodde's sales in proportion to either his stock holdings or his trading history. *See id.* at 986. Without more, plaintiffs have not raised an inference that his sales were unusual or suspicious, especially given plaintiffs' failure to plead that any other individual defendants similarly made unusual or suspicious stock sales. *See Nathenson v. Zonagen,* 267 F.3d 400, 421 (5th Cir.2001).

*In re Vantive,* 283 F.3d at 1085; *In re Fritz Cos. Sec. Litig.,* 282 F.Supp.2d 1105, 1114 (N.D. Cal.2003) (Patel J.).

Plaintiffs would be wise to substitute the complaint's baggage of boilerplate allegations with the particulars required by the PSLRA. If properly amended, plaintiffs' allegations may outweigh a counter-inference that CornerStone's accounting errors and overpriced acquisitions were the result of loose, even reckless mismanagement rather than intentional fraud or deliberate recklessness.

## V. Failure to State a Claim for Control Liability under Section 20(a)

Adequate pleading of a primary violation of section 10(b) is required for a plaintiff to adequately plead control liability under section 20(a). See 15 U.S.C. § 78t. As plaintiffs have failed to adequately plead a primary violation of section 10(b), the issue of control liability under section 20(a) is moot.

## VI. Leave to Amend

Leave to amend should be freely granted unless amendment would be futile. *See Klamath–Lake Pharmaceutical Ass'n v. Klamath Med. Serv. Bureau,* 701 F.2d 1276, 1293 (9th Cir.1983) (futile amendments should not be permitted); *Silicon Graphics,* 183 F.3d at 991 (denying leave to amend because defects in the pleadings could not be cured by amendment). In the present action, plaintiffs have consolidated and corrected their complaint. Amendment may not be futile in this case, as plaintiffs' complaint contains many of the factual allegations required to plead securities liability against CornerStone and the individual defendants. Their failure lay not in the raw content of their complaint, but in the absence of rigorously particular-ized allegations in accordance with the PSLRA. While this court regrets the accordingly painstaking effort that was required by this court and by defendants to interpret plaintiffs' pleading morass, leave to amend will be granted. Plaintiff is hereby forewarned that, given their previous opportunities to amend this complaint through the consolidation process, further leave to amend is unlikely to be granted.

Due to the sheer number of statements (nearly 100) alleged to be false in this case, the court instructs that plaintiffs submit their allegations in a chart[8] that satisfies the dictates of the PSLRA, specifying (1) each statement alleged to have been misleading, (2) the reason or reasons why the statement is misleading, and, (3) if an allegation regarding the statement or omission is made on information and belief, plaintiffs should state with particularity all facts on which that belief is formed. *See* 15 U.S.C. § 78u–4(b)(1). Plaintiffs must include in the chart particularized statements of the facts giving rise to a strong inference that the defendant acted with the required state of mind, alleging what the individual defendants knew and when they knew it. *See* 15 U.S.C. § 78u–4(b)(2) (emphasis added). Due to the length of the class period, and the fact that named plaintiff Lamphere purchased stock during a concentrated period in September and early October 2000, more than two years into the class period, the amended complaint must be particularly attentive to issues of time. *See* Check Dec., Exh A. It must provide grounds for this court to infer that statements made early in the class period were false or misleading when made, and that defendants issued those statements with knowledge or deliberate recklessness

---

**8.** The chart can be included in the body of the complaint or attached as an appendix and incorporated by reference.

as to their truthfulness. *See Silicon Graphics,* 183 F.3d at 974.

*CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss is GRANTED with leave to amend. The amended complaint shall be filed within thirty (30) days of the date of this order and shall be in accordance with the holdings and directions set forth in this order.

IT IS SO ORDERED.