Charles **WOZNIAK**, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

**ALIGN TECHNOLOGY, INC.**, Thomas M. Prescott, Defendants.

No. C 09–3671 MMC.

United States District Court, N.D. California.

Feb. 3, 2012.

Michael M. Goldberg, Lionel Z. Glancy, Glancy Binkow & Goldberg LLP, Los Angeles, CA, Brian O. O'Mara, Darren Jay Robbins, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Sarah Renee Holloway, Willow E. Radcliffe, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, for Plaintiff.

Caz Hashemi, Douglas John Clark, Katherine Leigh Henderson, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Molly Allison Arico, Wilson Sonsini Goodrich & Rosati, San Francisco, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT WITH LEAVE TO AMEND

MAXINE M. CHESNEY, District Judge.

Before the Court is defendants Align Technology, Inc. ("Align") and Thomas Prescott's ("Prescott") motion, filed September 7, 2011, to dismiss plaintiff's Second Amended Complaint ("SAC"). Lead plaintiff Plumbers and Pipefitters National Pension Fund, individually and on behalf of all others similarly situated, has filed opposition, to which defendants have replied. Having read and considered the parties' respective written submissions, the Court rules as follows.[1]

### BACKGROUND

Plaintiff alleges that Align, a company that "designs, manufactures, and markets Invisalign," a series of clear, removable teeth aligners, and Prescott, Align's Chief Executive Officer, "violated the securities laws by disseminating materially false and misleading statements and concealing material adverse facts regarding Align's growth prospects, business and ClinAdvisor product" between January 30, 2007 and October 24, 2007 (the "Class Period"). (*See* SAC ¶¶ 1, 2.)

In the SAC, plaintiff reiterates its original theory of liability related to the Patients First Program. Specifically, plaintiff alleges that, as the result of a pre-Class Period settlement with a competitor, OrthoClear, "Align agreed to make Invisalign treatment available to all OrthoClear patients existing as of September 27, 2006 at no additional charge to the patient, the doctor or OrthoClear under its 'Patients First Program'" (*see* SAC ¶ 66) (emphasis omitted);[2] that Align "did not have

---

**1.** On January 10, 2012, the Court took the matter under submission and vacated the hearing scheduled for January 13, 2012.

**2.** Plaintiff emphasizes various allegations throughout the SAC by using bold and italic type. Such emphasis is omitted in all quotations from the SAC throughout this order.

enough trained ClinCheck technicians in place during the Class Period to handle the new revenue cases and Patients First cases" (*see* SAC ¶ 92); and that, as a result of the additional cases and staff shortage, "Align was overwhelmed with thousands of free Patients First cases in the first two quarters of 2007, creating a significant backlog of both Patients First cases and new revenue cases" (*see* SAC ¶ 12).

Additionally, plaintiff alleges a new theory of liability. Specifically, plaintiff alleges that, "[i]n order to increase utilization[3] and, in turn, sales, in October 2006, Align announced the launch of 'ClinAdvisor,' 'a new suite of software tools designed to make Invisalign case selection, submission and review process more efficient for doctors'" (*see* SAC ¶ 4); that "ClinAdvisor's underlying 'hypothesis' was based on a flawed concept" (*see* SAC ¶ 8); that "ClinAdvisor was supposed to assist GPs [general practitioner dentists] in determining whether or not a case was feasible for Invisalign use by providing comparable cases from Align's extensive database ... [but] the GPs' lack of experience in orthodontia made it difficult for them to evaluate the complexity of a case, even with a comparable case model" (*see* SAC ¶ 74); that "feedback [from a beta test] in January 2007 showed that ClinAdvisor was not effective at helping GPs with case selection" (*see* SAC ¶¶ 10, 52); that "feedback on a limited ClinAdvisor release in April/May 2007 was also negative and indicated that ClinAdvisor would not positively contribute to Align's sales and revenues" (*see* SAC ¶ 10); and that "an internal marketing study in June/July 2007 confirmed that ClinAdvisor was not improving revenue or meeting projected sales" (*see id.*).

Plaintiff alleges Align's failure to disclose the significant backlog and problems with ClinAdvisor rendered statements in three press releases and accompanying conference calls, on January 30, 2007, April 26, 2007, and July 25, 2007, respectively, knowingly misleading. (*See* SAC ¶¶ 7, 9.) Thereafter, according to the SAC, the truth about the backlog and ClinAdvisor emerged by way of Align's October 24, 2007 announcement that it expected to ship in 2007 approximately 4000 to 5000 cases fewer than its previous expectation of 206,000 to 209,000 cases resulting in Align's stock price falling $9.63, or approximately 34%. (*See* SAC ¶¶ 110, 117).

Based on said allegations, the SAC asserts three causes of action: (1) violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b–5 promulgated thereunder, against both defendants; (2) insider trading violations of § 10(b) and Rule 10b–5 against Prescott; and (3) violation of § 20(a) of the Exchange Act against both defendants. (*See* SAC ¶¶ 166–74.)

## LEGAL STANDARD

"Dismissal under Rule 12(b)(6) can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *See Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990). In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party. *See NL Indus., Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127

---

**3.** According to the SAC, "[u]tilization is the average number of cases submitted per doctor and was the main performance metric used at Align." (*See* SAC ¶ 3.)

S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 129 S.Ct. at 1950.

## DISCUSSION

### I. Section 10(b)

 To allege a § 10(b) and Rule 10b–5 claim, a plaintiff must allege "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance ... (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *See Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (citations omitted). Claims brought under § 10(b) and Rule 10b–5 must meet the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 9(b) ("In alleging fraud ..., a party must state with particularity the circumstances constituting fraud."); *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985) (applying Rule 9(b) to § 10(b) and Rule 10b–5 claim). " 'In a securities fraud action, a pleading is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer.' " *Fecht v. Price Co.,* 70 F.3d 1078, 1082 (9th Cir.1995) (quoting *Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994)). To provide sufficient notice, a plaintiff, in addition to alleging the "time, place and nature of the alleged fraudulent activities," must "plead evidentiary facts" sufficient to establish any allegedly false statement "was untrue or misleading when made." *See id.*

Further, such plaintiff must meet the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, which requires the plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *See* 15 U.S.C. § 78u–4(b)(1). Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See id.* § 78u–4(b)(2). To the extent an allegation is based on information and belief, the plaintiff must allege "with particularity all facts on which that belief is formed." *See id.* § 78u–4(b)(1). In so doing, the plaintiff must "reveal the sources of [his] information." *See In re Daou Sys., Inc.,* 411 F.3d 1006, 1015 (9th Cir.2005) (internal quotation and citation omitted).

### A. Allegations as to Patients First

Plaintiff's allegations as to the Patients First program, and related allegations as to Align's processing capacity, backlog and sales focus, remain essentially the same as the allegations previously found deficient by the Court. (*See* SAC ¶¶ 11–15, 71, 80–82, 85–86, 91–94, 98, 102, 106–109, 111–114, 122, 125–139.)

First, plaintiff relies on the same statements made by Prescott in January and April 2007, (*compare* SAC ¶¶ 71, 85–86 *with* FAC ¶¶ 49, 69–70), and, once again, argues the statements are actionable because Prescott either was "aware of undisclosed facts tending seriously to undermine the statements' accuracy" or there was "no reasonable basis for the belief." (*See* Opp. at 13:8–11 (internal quotation, citation, and alterations omitted).) In support thereof, plaintiff relies primarily on the same allegations as made in the FAC. (*Compare* SAC ¶ 81 *with* FAC ¶ 58; SAC ¶ 82 *with* FAC ¶ 62; SAC ¶ 91 *with* FAC ¶ 73; SAC ¶ 92 *with* FAC ¶ 60; SAC ¶ 93 *with* FAC ¶ 61; SAC ¶ 94 *with* FAC ¶ 74;

SAC ¶ 108 *with* FAC ¶ 65; SAC ¶ 109 *with* FAC ¶ 64; and SAC ¶ 113 *with* FAC ¶ 86). Such allegations were and remain insufficient to establish liability under Section 10(b). (*See* Order Granting Defendants' Motion to Dismiss Plaintiff's Amended Complaint with Leave to Amend, filed June 8, 2011 ("Order") at 7:15–8:14, 14:15–15:12, 2011 WL 2269418.)

The only new allegations relevant to the January and April 2007 statements are based on information attributed to three newly alleged confidential witnesses, identified as "CW9", "CW10" and "CW11."[4] According to the SAC, CW9 reportedly witnessed a PowerPoint presentation comprised of slides with "high level numbers regarding various key metrics for manufacturing, order backlog and order fulfillment ... [which] showed that Align was overwhelmed with fulfilling Patients First orders and had a backlog of new revenue orders." (*See* SAC ¶¶ 43, 137.) Similarly, plaintiff alleges, "[a]ccording to CW9 and CW10, Align was overwhelmed with fulfilling Patients First cases, creating a significant backlog for both Patients First cases and new revenue cases." (*See* SAC ¶ 91.) Plaintiff alleges that CW11 put together daily "run-rate reports" showing "how close (or far) the Company was from achieving its manufacturing goals for the period." (*See* SAC ¶¶ 49, 131.) These allegations suffer from the same deficiencies as allegations of a similar nature contained in the FAC. (*See* Order at 8:10–17.) As before, the allegations attributed to the CWs "do not contradict defendants' generalized statements as to Align's growth, progress, consumer demand, or physician interest." (*See id.*)

With respect to the July 2007 statements, plaintiff repeats its allegation that Align's projection that "Align would increase its new revenue case shipments in Q3 and Q4" and would increase its "2007 case shipment guidance" was false. (*Compare* SAC ¶ 98 *with* FAC ¶ 78.) The Court previously held the PSLRA safe harbor, discussed in detail below, applies to the July 2007 projection, both because it "quali[ed] as forward-looking" and because it was "accompanied by meaningful cautionary statements." (*See* Order at 9:10–11:14.) Plaintiff contends the Court erred in holding the "safe harbor" applicable to these statements because, according to plaintiff, the Court did not consider whether the cautionary statements themselves were misleading. (*See* Opp. at 16:13–18.) Contrary to plaintiff's contention, the Court, as set forth in its prior order, considered all aspects of the cautionary statements and found they "identified the risks plaintiff alleges ultimately materialized, specifically, the risk of a backlog created by the OrthoClear settlement and resulting effects on sales." (*See* Order at 10:6–11:12.) Plaintiff offers no new factual allegations in the SAC, nor any other reason for the Court to reconsider its prior findings as to the July 2007 statements.

### B. Allegations as to ClinAdvisor
#### 1. Material Misrepresentations/Omissions

Plaintiff alleges various statements about ClinAdvisor's prospects for increasing utilization and revenue, made in Align's January, April, and July 2007 conference calls, were misleading because ClinAdvisor

---

**4.** In the SAC, CW9 is alleged to have been a Manager of Clinical Training at Align from 2005 until mid-August 2007 (*see* SAC ¶ 43), CW10 is alleged to have been a Director of Engineering at Align from February 2004 until the end of 2008 and the Lead Engineer for ClinAdvisor (*see* SAC ¶ 47), CW11 is alleged to have been a Senior Business Intelligence Analyst at Align from 2005 until August 2010 (*see* SAC ¶ 49), and CW12, discussed *infra,* is alleged to have been a Senior Director of Software Development at Align from September 2006 to July 2008 (*see* SAC ¶ 50).

"was based on a flawed concept" and was "not effective." (*See* SAC ¶¶ 10, 48.) As discussed below, the SAC fails to provide a sufficient factual basis to support plaintiff's allegations that the identified statements were false or misleading.

### a. Statements of Belief and Optimism

 " '[V]ague, generalized, and unspecific assertions' of corporate optimism or statements of 'mere puffing' cannot state actionable material misstatements of fact under federal securities laws." *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F.Supp.2d 1069, 1087 (N.D.Cal. 2005) (quoting *Glen Holly Entm't v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003)). "Although projections and general statements of optimism may trigger liability under federal securities laws, statements that are so vague or amorphous that no reasonable investor could rely on them are not actionable." *In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086, 1096 (N.D.Cal.1994) (internal citation omitted), *aff'd*, 95 F.3d 922 (9th Cir.1996). "When valuing corporations, ... investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir.2010).

The "mere puffery" rule has been interpreted to include "statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years.' " *See Cornerstone*, 355 F.Supp.2d at 1087 (finding defendant's "claims of 'industry leading' growth, growth that 'positions us beautifully,' 'measurable progress,' 'continuing improvements,' 'accomplishments we have achieved,' expressions of pride in [our] staff, 'outstanding retail results,' and other similar comments all constitute vague, unspecific assertions of corporate optimism"); *Syntex Corp.*, 855 F.Supp. at 1095 (holding as non-actionable puffery the phrases " '[w]e're doing well and I think

we have a great future,' '[b]usiness will be good this year ..., [w]e expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first ...,' 'everything is clicking [for the 1990s] ..., new products are coming in a wave, not in a trickle ..., old products are doing very well,' and that 'I am optimistic about [our] performance during this decade' ").

 Here, a number of the statements identified by plaintiff constitute such puffery. Specifically, plaintiff alleges that in the January 2007 conference call, defendant Prescott stated, with respect to ClinAdvisor, "[w]e are very pleased with the learning from our pilot launch" (*see* SAC ¶ 69) and "so far we're getting really great feedback" (*see* SAC ¶ 70). Similarly, plaintiff alleges that in the April 2007 conference call, Prescott stated: "we are very pleased with our progress to date on key strategic initiatives" (*see* SAC ¶ 83); "[w]e are confident the improved features for Orthos [orthodontists] and GPs will increase and sustain utilization" (*see id.*); "importantly, [ClinAdvisor is] a very good front-end" (*see* SAC ¶ 84); and "ClinAdvisor is a first step for the GP towards being a trusted advisor" (*see id.*). Plaintiff alleges that, in the July 2007 conference call, Prescott misled investors regarding ClinAdvisor by stating, "ClinAdvisor ... has now been launched nationally" and "will be rolled out broadly as a key element of [Align's] customer utilization growth strategy." (*See* SAC ¶ 95).

The above-quoted statements are generalized statements of optimism that constitute "non-actionable puffing." *See Syntex Corp.*, 855 F.Supp. at 1095. In particular, "[w]e are very pleased with the learning from our pilot launch" (*see* SAC ¶ 69); "getting really great feedback" (*see* SAC ¶ 70); "we are very pleased with our progress to date" (*see* SAC ¶ 83); "[w]e are

confident the improved features in user experience for Orthos and GPs will increase and sustain utilization" (*see id.*); ClinAdvisor "is a very good front-end" (*see* SAC ¶ 84); and ClinAdvisor will be "a key element of [Align's] customer utilization growth strategy" (*see* SAC ¶ 95) are, in essence, "feel good" statements, i.e., statements on which investors do not rely when valuing corporations. *See Cutera,* 610 F.3d at 1111. Accordingly, the above statements constitute puffery.

■ Under some circumstances, a projection of optimism, or puffery, may constitute a " 'factual' misstatement actionable under § 10(b)," specifically, "if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *See Kaplan v. Rose,* 49 F.3d at 1375.

Here, relying on information alleged to have been provided by CW9, CW10, and CW12, plaintiff contends Prescott did not believe his optimistic statements regarding ClinAdvisor and/or was aware of undisclosed facts that would have undermined the statements' accuracy.

According to the SAC, CW9 states that "[t]he feedback Align received from its limited April/May launch indicated that ClinAdvisor would not positively contribute to sales and revenues, even if a final version was released" (*see* SAC ¶ 89), that a marketing study conducted in June and July 2007 "confirmed earlier indications that ClinAdvisor was not improving revenue or meeting its projected sales" (*see* SAC ¶ 104), and that he "personally informed defendant Prescott that [ClinAdvisor] could not be launched until June 2007"

(*see* SAC ¶ 45); CW10 states that "ClinAdvisor was based on a flawed concept and, although it was ultimately released, Align knew that the product was ineffective and made no plans to improve or enhance it" and that "Prescott was aware that ClinAdvisor was ineffective both during its beta testing and after its commercial launch because there were no efforts to increase its functionality, continue development or release a version 2.0" (*see* SAC ¶ 48); CW12 states that "the feedback from beta users was poor and that ClinAdvisor was not effective in helping doctors choose even easy or medium-level cases" (*see* SAC ¶ 52).

■ The above allegations, even assuming said confidential witnesses have sufficient knowledge upon which to base them,[5] do not suffice to demonstrate Prescott's lack of belief in or lack of a reasonable basis for what he was asserting, nor do they demonstrate Prescott's knowledge of undisclosed facts seriously undermining the statements' accuracy. In particular, the CWs' conclusory statements that initial feedback regarding ClinAdvisor was negative, "poor," or that an unspecified number of users found it "ineffective," do not contradict Prescott's optimistic statements.

Moreover, the above-referenced statements by CWs as to ClinAdvisor's effectiveness concern a 2006 "pilot launch," an April 2007 "limited release" (*see* SAC ¶¶ 76, 89, 103) and a marketing study conducted in June and July 2007 (*see* SAC ¶ 104). The SAC contains no factual allegations regarding feedback on ClinAdvisor or its effect on utilization after July 2007, the month in which ClinAdvisor is alleged to have launched nationally. (*See* SAC

---

5. Confidential witnesses may be used to support allegations only if such "sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." *See Daou,* 411 F.3d at 1015 (internal quotation and citation omitted).

¶ 95.) Rather, the plaintiff's allegations concern limited releases of ClinAdvisor, which resulted in some unspecified amount of negative feedback, to which Align responded. (*See* SAC ¶ 124 (alleging Prescott "personally authorized additional resources for [ClinAdvisor's] development" prior to national launch).) None of plaintiff's allegations regarding the development phases of ClinAdvisor demonstrate Prescott did not believe the general, optimistic statements he made at the time he made them or was otherwise aware of undisclosed facts tending to undermine their accuracy.

Accordingly, plaintiff's allegations as to such statements fail to meet the pleading requirements of Rule 9(b) and the PSLRA.

### b. Forward–Looking Statements

A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *See No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir.2003) (citing 15 U.S.C. § 78u–5(i)). Under the PSLRA, a person may not be held liable for a forward-looking statement, provided the statement (1) is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or (2) is "immaterial." *See* 15 U.S.C. § 78u–5(c)(1)(A). On the other hand, if such statement is not identified as forward-looking and/or is unaccompanied by meaningful cautionary language, such statement falls outside the safe harbor if the plaintiff can show it "was made with actual knowledge by [the speaker] that the statement was false or misleading." *See id.* at § 78u–5(c)(1)(B); *Provenz v. Miller,*

102 F.3d 1478, 1487 (9th Cir.1996) ("A projection is a factual misstatement if (1) the statement is not actually believed, (2) there is no reasonably basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.") (emphasis, internal quotation and citation omitted).

Here, plaintiff bases its claims on a number of forward looking statements regarding Align's plans for ClinAdvisor. In particular, the SAC alleges that during the January 30, 2007 conference call, Prescott stated: "[o]ur goals in 2007 are straightforward" and include "extending the GP-focused ClinAdvisor product features and functionality" (*see* SAC ¶ 69), and "[t]he goal here is that you play a turnkey system for the GP, making it easier to select simple cases, simplify the diagnostic and setup process, and ensure great results" (*see id.*). The SAC further alleges that, during the April 2007 call, Prescott stated: "ClinAdvisor will help newly certified and less experienced doctors learn how to assess and select appropriate cases" and "[t]his should boost the early confidence and clinical success of new users" (*see* SAC ¶ 83).

▮ The above-listed statements qualify as forward-looking. *See* 15 U.S.C. § 78u–5(i)(1)(A)-(F) (defining "forward-looking statement" as, *inter alia,* "a statement of the plans and objectives of management for future operations," and "any statement of the assumptions underlying or relating to any [such] statement"). Further, the statements, when made, were (1) identified as forward-looking and (2) accompanied by meaningful cautionary statements. *See* 15 U.S.C. § 78u–5(c)(1)(A). For example, in the January 2007 conference call, Align stated:

> During this conference call, we may make forward-looking statements relating to Align's expectations about future

events, products and future results .... Any forward-looking statements we make during the conference call are based upon information available to Align, as of the date hereof.

Listeners are cautioned that these forward-looking statements are only predictions and are subject to risk, uncertainties, and assumptions that are difficult to predict. As a result, actual results may differ materially and adversely from those expressed in any forward-looking statements. Factors that might cause such a difference include, but are not limited to risks that are detailed from time-to-time in Align's periodic reports filed with the SEC, including but not limited to its Annual Report on Form 10–K for the fiscal year ended December 31, 2005, which was filed with Securities and Exchange Commission on March 1, 2006, and quarterly reports on form 10–Q.

(*See* Arico Decl. Ex. 8 at 1 (Jan.2007 call tr.); *see also id.* Ex. 3 at 1 (Apr.2007 call tr.), Ex. 5 at 1 (July 2007 call tr.).) [6] The January 2007 conference call also incorporated by reference Align's Form 10–K for the period ending December 31, 2006, which filing cautioned:

> We recently announced a phased rollout of ClinAdvisor, a new suite of software tools designed to make Invisalign case selection and submission processes more

efficient for doctors. In addition, we plan to introduce a further series of software enhancements that will evolve Invisalign into distinct suites of software tools for the orthodontist and GP. There can be no assurance that we will be able to successfully develop, sell and achieve market acceptance of these and other new products and applications and enhanced versions of our existing product. The extent of, and rate at which, market acceptance and penetration are achieved by future products is a function of many variables, which include, among other things, price, safety, efficacy, reliability, marketing and sales efforts, the availability of third-party reimbursement of procedures using our new products, the existence of competing products and general economic conditions affecting purchasing patterns.... Any failure in our ability to successfully develop and introduce new products or enhanced versions of existing products and achieve market acceptance of new products and new applications could have a material adverse effect on our operating results and could cause our revenues to decline.

(*See* Arico Decl. Ex. 9, at 26) [7]; *In re Tibco Software, Inc.,* No. C 05–2146 SBA, 2006 WL 1469654, at *27 (N.D.Cal. May 25, 2006) (considering, as part of cautionary statements, Form 10–Q incorporated by reference in conference call). These cautionary statements identified the risks

---

**6.** Defendants request the Court take judicial notice of the above-referenced three exhibits to the Declaration of Molly Arico. Plaintiff does not argue said exhibits are not subject to judicial notice, *see United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003) (holding court may consider "documents incorporated by reference in the complaint"); rather, plaintiff objects to the Court's taking judicial notice of certain "unreasonable inferences" defendants seek to draw therefrom. (*See* Opp. to Request for Judicial Notice at 5:13–6:18, 10:1–13.) The Court, however, has considered said exhibits solely for the limited

purpose of determining the context in which the allegedly misleading statements were made.

**7.** Defendants request the Court take judicial notice of Exhibit 9, and there is no objection thereto. *See Shurkin v. Golden State Vintners Inc.,* 471 F.Supp.2d 998, 1011 (N.D.Cal. 2006), *aff'd,* 303 Fed.Appx. 431 (9th Cir.2008) (holding Court may take judicial notice of SEC filings "for the fact that these documents . . . were publicly-filed and for the fact that the statements made were made to the public on the dates specified").

plaintiff alleges ultimately materialized, specifically, the risk that ClinAdvisor would not be widely accepted and used, and the risk that it would not increase utilization and sales.

Moreover, plaintiff fails to allege facts showing the statements were made with *actual knowledge of falsity.* Forward-looking statements, even when unaccompanied by meaningful cautionary statements, fall outside the safe harbor only if the plaintiff alleges facts that would create a strong inference that the defendant made such statements with actual knowledge of falsity. *See* 15 U.S.C. § 78u–5(c)(1)(B); *In re Cutera*, 610 F.3d at 1112. Here, plaintiff's general allegations that ClinAdvisor was "ineffective" in development (*see* SAC § 48) and "based on a flawed concept" (*see id.*) do not demonstrate that Prescott falsely stated Align's goals, either generally or as to ClinAdvisor specifically, at the time the statements were made.

Consequently, defendants' stated objectives and other forward-looking statements fall within the PSLRA's safe harbor.

#### c. Omissions

Plaintiff alleges the remainder of the statements in the conference calls regarding ClinAdvisor were misleading because defendants failed to disclose that ClinAdvisor was based on a "flawed concept." (*See* SAC ¶ 74.) Plaintiff alleges: "according to CW9, ClinAdvisor's software was complicated and time-consuming to use and required Align's sales teams to spend a lot of time instructing GPs how to use it" (*see* SAC ¶ 75); "CW9 further reported that feedback on a limited ClinAdvisor release in April/May 2007 was also negative and indicated that ClinAdvisor would not positively contribute to Align's sales and revenues" (*see* SAC ¶ 10); "[a]ccording to CW9, as of April 26, 2007, ClinAdvisor was still not fully developed and feedback from initial users was negative" (*see* SAC ¶¶ 89, 124); "CW9 reported that in June/July

2007, Align completed a marketing study to assess the effectiveness of its clinical education, including ClinAdvisor ... [which] confirmed earlier indications that ClinAdvisor was not improving revenue or meeting its projected sales" (*see* SAC ¶ 104); "CW10 confirmed that Prescott was aware that ClinAdvisor was ineffective both during its beta testing and after its commercial launch because there were no efforts to increase its functionality, continue development or release a version 2.0" (*see* SAC ¶¶ 48, 90, 123); "CW12 reported that feedback [regarding ClinAdvisor] from early users in January 2007 was negative" (*see* SAC ¶ 8); and "according to CW12, dentists (and patients) did not like that, after taking a model of the patient's teeth, the patient had to come back two to three weeks later just to learn whether their case was easy, medium or difficult and whether the GP could assist them" (*see* SAC ¶ 74).

 "To be actionable under the securities laws, an omission must be misleading." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir.2002). "[I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* "Silence, absent a duty to disclose, is not misleading." *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

Here, plaintiff alleges omission of the above-described circumstances rendered the following statements by Prescott in the January and April 2007 conference calls regarding ClinAdvisor's efficacy misleading: "we are finding that doctors are using [ClinAdvisor] for real-time as we had originally thought, for real-time discussions with patients at chair side and to improve their submissions" and "I think the jury is still out on this hundred [in the beta test], but the net is that they are

more comfortable using it and more comfortable discussing it at chair side with patients, which has always been an issue for GPs" (*see* SAC ¶ 70); "ClinAdvisor starts to help [GPs] select the right cases and support them as they get going[,] [a]nd so, ClinAdvisor is a first step for the GP towards being a trusted advisor, a clinical resource, and leading them more towards a turn-key solution" (*see* SAC ¶ 84); and Prescott's response of "[t]hat is still right" to an analyst's inquiry whether the "ultimate hypothesis, which was that [ClinAdvisor] would help get more GPs started more confidently, seems to be holding" (*see* SAC ¶ 70).

Plaintiff further alleges omission of the above-described circumstances rendered misleading the following statements by Prescott in the July 25, 2007 conference call regarding ClinAdvisor's ability to increase utilization and sales: "[e]arly feedback [after national launch] tells us it really helps newly certified and less experienced doctors select appropriate cases based on their experience and skill set, which is exactly what we were hoping to achieve" (*see* SAC ¶ 95); "[w]e continue to see expansion in our customer base, both newly trained and repeat submitters, as well as progress in utilization growth for orthos, GPs, and international, as well as solid demand at the consumer level" (*see* SAC ¶ 97); and "[w]e are seeing newly certified doctors start their cases sooner"—"seeing the ramp a little bit faster"—"[t]hese are all relative statements"—"[t]he ramp to adoption a little quicker in those newer trained cohorts of doctors . . . but the bigger effect is more of a widespread general slow but important increase in utilization growth across most cohorts of previously trained docs" (*see* SAC ¶ 96).

Assuming, *arguendo*, a sufficient basis for the information provided by the CWs, plaintiff fails to show how the above

statements were misleading in light of the alleged omissions. *See Fecht,* 70 F.3d at 1083 (noting plaintiff must show "how and why the statement was misleading when made"). No CW is alleged to have said doctors were not using ClinAdvisor for real-time discussions with patients, nor is any CW alleged to have said ClinAdvisor did not help doctors feel more comfortable. CW9 and CW12's assertions that an unspecified amount of early feedback on ClinAdvisor was "negative" (*see* SAC ¶¶ 8, 10) do not contradict Prescott's statement that ClinAdvisor helped some GPs select appropriate cases, and, although plaintiff alleges in a conclusory manner that "ClinAdvisor was based on a flawed concept and would not increase sales volumes or utilization rates" (*see, e.g.,* SAC ¶ 90), the SAC is devoid of facts showing how defendants knew ClinAdvisor would not help to increase such rates, let alone facts showing such knowledge at the early phases of its development. Indeed, no CW provides facts sufficient to show Prescott was incorrect when he stated that, as of July 25, 2007, Align was experiencing an increase in utilization growth either generally or among doctors using ClinAdvisor in the limited release.

In sum, plaintiff fails to show the alleged omissions "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]," *see Brody,* 280 F.3d at 1006, and, consequently, plaintiff fails to state a claim under the PSLRA based on any such alleged omission.

## C. Scienter

In the SAC, plaintiff alleges scienter based on the same five grounds as alleged in the FAC: (1) defendants' knowledge of internal reports (*compare* SAC ¶¶ 124, 126–32 *with* FAC ¶¶ 94–98); (2) management's attendance at and knowledge of

corporate meetings (*compare* SAC ¶¶ 124, 133–39 *with* FAC ¶¶ 99–104); (3) a presumption that, as Align's CEO, Prescott had knowledge of adverse facts affecting Align's core business (*compare* SAC ¶ 140–42 *with* FAC ¶ 107); (4) Prescott's "admissions" in press releases and conference calls (*compare* SAC ¶¶ 110–14, 125–26 *with* FAC ¶¶ 84–87, 105–106); and (5) "[i]nsider [s]ales" during the Class Period by Prescott and other executives (*compare* SAC ¶¶ 144–49 *with* FAC ¶¶ 108–113).

 To plead scienter under the PSLRA, a plaintiff must plead with particularity facts that "constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *See DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388–89 (9th Cir.2002); 15 U.S.C. § 78u–4(b)(2). For a plaintiff to allege a strong inference of deliberate recklessness, such plaintiff "must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.1999) (*rev'd on other grounds, South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir.2008)). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Although the plaintiff need not allege facts giving rise to an "irrefutable" inference of scienter, and although the complaint must be viewed "holistically," the plaintiff "must plead facts rendering an inference of scienter at *least as likely* as any plausible opposing inference." *See id.* at 324, 326, 328, 127 S.Ct. 2499 (emphasis in original). For the reasons stated below, plaintiff fails to allege sufficient facts to support an inference of scienter on the part of either Align or Prescott.

### 1. Internal Reports

The Court previously found plaintiff's allegations regarding internal reports insufficient to plead scienter, because "[a]lthough plaintiff refer[red] to the existence of sales and shipment data and ma[de] a general assertion about what the data showed, plaintiff allege[d] no hard numbers or other specific information." (*See* Order at 19:1–8 (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035–36 (9th Cir.2002) (holding plaintiffs failed to plead claim under PSLRA where plaintiffs alleged defendant pharmaceutical corporation "could regularly track its sales data," which "indicated that test patient demand was flat," but failed to "plead, in any detail, the contents of such report or the purported data"))); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corporation*, 380 F.3d 1226, 1230–31 (9th Cir.2004) (finding internal report allegations sufficient to support strong inference of scienter where plaintiff alleged "hard numbers and ma[de] specific allegations regarding large portions of [defendant's] sales data").

The great majority of plaintiff's allegations as to Align's internal reports are identical to those the Court found inadequate in the FAC. (*Compare* SAC ¶ 128 *with* FAC ¶ 95; SAC ¶ 129 *with* FAC ¶ 96; SAC ¶ 130 *with* FAC ¶¶ 96, 97.) Plaintiff's new allegations fail for the same reason as the prior allegations, in that they include no "hard numbers" or other specifics. *See Oracle*, 380 F.3d at 1230–31. Although the SAC alleges CW11 created and Prescott received daily "run-rate" reports that tracked various manufacturing and shipping data, such allegations are not significantly different from plaintiff's prior allegations and, as with those prior allegations, do not include data or other detail. (*Compare* SAC ¶ 131 *with* FAC ¶¶ 95–97.)

### 2. Corporate Meetings

Plaintiff next points to sales conference calls, sales meetings, financial reviews, manufacturing meetings, and executive management committee meetings. (*Compare* SAC ¶¶ 124, 133–39 *with* FAC ¶¶ 99–104.) The Court previously held such allegations insufficient to establish a strong inference of scienter because, as with the internal reports, the FAC contained "no allegation as to any 'hard numbers' . . . discussed with Prescott at any meeting, let alone numbers that would serve to contradict Prescott's statements." (*See* Order at 20:9–11 (quoting *Oracle*, 380 F.3d at 1231).) The new allegations fail to cure the noted deficiencies. The added allegation that CW9 attended a presentation with "PowerPoint slides" that "contain[ed] key metrics" and "showed that Align was overwhelmed with fulfilling Patients First orders and had a backlog of new revenue orders" provides no detail as to the content of those slides, let alone data sufficient to contradict Prescott's statements. (*See* SAC ¶¶ 43, 137.) Similarly, although CW12 is now alleged to have attended a meeting at which Align's Product Manager reported that "early beta users did not find ClinAdvisor to be helpful," the SAC provides no data or other detail to contradict any of Prescott's statements. (*See* SAC ¶ 124.)

Moreover, as with the FAC, the SAC's allegations are insufficient to connect information allegedly discussed at meetings to Prescott. CW9's speculation about what was conveyed at meetings he did not attend, and about Prescott's receipt of unspecified "updates" CW9 did not see, do not establish a strong inference of scienter. (*See* SAC ¶¶ 124, 136–38; *see also* Order at 20:18–24 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 994, 998 (9th Cir.2009) (finding allegation CFO attended various meetings and "had to have known what was going on with respect to

the Company's inventory accounting manipulation" insufficient to support strong inference of scienter).) The only new allegation regarding information actually conveyed to Prescott is plaintiff's allegation that CW9 told Prescott "ClinAdvisor could not be developed and deployed without a significant investment of time and money and, even then, could not be launched until June 2007." (*See* SAC ¶ 79.) Such information is not inconsistent with any of Prescott's statements, and particularly in light of plaintiff's allegations that Prescott did in fact direct additional resources to ClinAdvisor's development (*see* SAC ¶ 124) and that ClinAdvisor was in fact launched in July 2007 (*see* SAC ¶ 95)).

### 3. Core Operations

Plaintiff again alleges that Prescott, as CEO of Align, "can be presumed to have knowledge of adverse facts affecting the Company's core business" which is "the sale and shipment of new revenue cases." (*Compare* SAC ¶ 142 *with* FAC ¶ 107.)

"Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard." *See South Ferry*, 542 F.3d at 784. "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegations of specific information." *Id.* at 784–85 (noting, in "some unusual circumstances," "core operations inference" will suffice to raise requisite "strong inference"). The Court previously found plaintiff's reliance on the core operations inference unavailing, because "plaintiff fail[ed] to allege any facts about Prescott's actual exposure to 'adverse facts affecting [Align's] core business' (*see* FAC ¶ 107), nor circumstances cognizable as 'unusual'

for purposes of the 'core operations inference.'" (*See* Order at 21:7–12 (quoting *South Ferry*, 542 F.3d at 784 (citing, as example of unusual circumstances, case where defendant allegedly failed to disclose loss of two largest customers, comprising 80% of company's revenue)).) As discussed above, plaintiff again fails to allege Prescott's actual exposure to information inconsistent with his statements; nor has plaintiff added allegations of circumstances sufficiently "unusual" as to give rise to the core operations inference.[8]

#### 4. Later "Admissions"

Plaintiff again alleges, as in the FAC, that Prescott, in the October 24, 2007 conference call, "admitted" that "Align's sales force had 'moved their focus away from generating case growth' during the Class Period in order to focus on 'managing backlog and turnaround and expediting of cases'" and that "the sales teams 'weren't pushing as hard to get new case starts' and 'did not focus enough effort on filling the pipeline for new case starts.'" (*Compare* SAC ¶¶ 112, 153 *with* FAC ¶ 116.) As the Court previously noted, although "'[a] later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement ... [i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood.'" (*See* Order at 21:21–25 (quoting *In re Read–Rite Corp.*, 335 F.3d 843, 846 (9th Cir.2003)).) Plaintiff's unchanged allegations were and remain insufficient.

The SAC's allegation as to an additional "admission" likewise is insufficient. Plaintiff now alleges Prescott, on January 9, 2008, stated Align had "known for some time that there's a consistent theme out there with our doctors.... they need different features than we've given them." (*See* SAC ¶ 123 (ellipses in original).) Although plaintiff alleges the reference is to ClinAdvisor, the statement, when read in full and in context, is more general in nature. (*See* Arico Decl. Ex. 14 at 3 ("We've known for some time that there's a consistent theme out there with our doctors, *whether they be GPs or orthos.* They want ease of use. They need different features than we've given them. They have a wide range of case complexity. And they need much greater predictability. We understand that. *And now we understand that in detail.*") (emphasis added).)[9] Moreover, such statements, even if understood to refer specifically to ClinAdvisor, do not "directly contradict" Prescott's

---

8. Citing *South Ferry LP No. 2 v. Killinger*, 687 F.Supp.2d 1248 (W.D.Wash.2009), plaintiff argues Prescott's public statements demonstrate scienter, because they "demonstrate his knowledge of the topics of which he speaks." (*See* Opp. at 18:11–19:8.) Plaintiff's reliance on such authority is unavailing. In *South Ferry*, the district court found scienter was adequately alleged where the defendants spoke "with a high degree of specificity" and represented to investors that they "had all of the information necessary to make accurate predictions." *See id.* at 1259–60. Here, as discussed above, Prescott's statements regarding both Patients First and ClinAdvisor are general, optimistic statements that do not purport to make detailed, accurate predictions supported by actual knowledge.

9. Defendants request the Court take judicial notice of the above-referenced exhibit to the Declaration of Molly Arico. Plaintiff does not argue the exhibit is not subject to judicial notice, *see Ritchie*, 342 F.3d at 908 (holding court may consider "documents incorporated b reference in the complaint"); rather, plaintiff objects to the Court's taking judicial notice "for the purposes defendants seek," namely, that the alleged statement "did not refer to ClinAdvisor." (*See* Opp. to Request for Judicial Notice at 10:14–28.) The Court, however, is entitled to consider said exhibit for the limited purpose of determining the context in which the alleged "admission" was made.

"earlier, cheerier" statements about ClinAdvisor. *See In re Read–Rite Corp.*, 335 F.3d at 846.

### 5. Stock Sales

Plaintiff's allegations as to Prescott's stock sales are essentially identical to the allegations in the FAC, and remain insufficient to raise a strong inference of scienter. (*See* Order at 22:3–23:1; *compare* SAC ¶¶ 144–49 *with* FAC ¶¶ 109–13.) Likewise, plaintiff's allegations as to stock sales by other Align executives are essentially identical to those in the FAC (*compare* SAC ¶¶ 146–48 *with* FAC ¶¶ 110–12), and, as previously noted, "[s]ales by insiders not named as defendants ... are irrelevant to the determination of the named defendant's scienter" (*see* Order at 23:3–10).[10]

Rather than offer new factual allegations, plaintiff argues the Court "misread" *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir.2008), as "creat[ing] a bright-line test" that "requir[es] sales amounts of more than 37% of a defendants' [sic] stock to support scienter." (*See* Opp. at 22:1–3.) Contrary to plaintiff's assertion, the Court considered the three relevant factors identified in *Metzler*, specifically, "(1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." (*See* Order at 22:7–10; *Metzler*, 540 F.3d at 1067.)

### 6. Plaintiff's Scienter Allegations as a Whole

Plaintiff argues the allegations in the SAC, taken as a whole, establish scienter.

In assessing a pleading, the Court must "consider the complaint in its entirety" to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322–23, 127 S.Ct. 2499. "Vague or ambiguous allegations are ... properly considered as part of a holistic review when considering whether the complaint raises a strong inference of scienter." *South Ferry*, 542 F.3d at 784. "When conducting this holistic review, however, [the court] must also 'take into account plausible opposing inferences' that could weigh against a finding of scienter." *Zucco Partners*, 552 F.3d at 1006 (quoting *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499).

In its prior order, the Court found the FAC's allegations were "insufficient to raise an inference of scienter that is as 'cogent and at least as compelling as any opposing inference of nonfraudulent intent,'" (*see* Order at 23:20–22 (quoting *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499)), and, in particular, that "the FAC fail[ed] to raise an inference that is as compelling as the opposing inference that Align, without any intent to defraud, simply failed to accurately predict the magnitude of the effect of the Patients First Program on Align's ability to produce new revenue cases, resulting in a modest, approximately 2%, reduction in Align's anticipated case shipments for 2007." (*See* Order at 23:22–24:1.) The Court's reasoning is equally applicable to the allegations in the SAC. The more compelling inference is that Align, without any intent to defraud, simply failed to accurately predict the precise ef-

---

10. Plaintiff argues "the Ninth Circuit has considered sales by other 'executives as well as [even] defendants' family members' as part of the mix 'sufficient to create a strong inference' of scienter." (*See* Opp. at 23:6–9 (quoting *In re Daou Sys.*, 411 F.3d at 1024).) Contrary to plaintiff's argument, the Court in *Daou*, although noting the plaintiffs' allegations as to executives and family members' stock sales, analyzed only the defendants' sales as a basis for scienter. *See Daou*, 411 F.3d at 1024 (holding "defendants' suspicious stock sales ... plus the complaint's specific allegations of [their] deliberate accounting misfeasance create a strong inference of scienter").

fects that either the Patients First Program or ClinAdvisor would have on new revenue cases.

In sum, the SAC fails to sufficiently allege scienter under the PSLRA.

### D. Loss Causation

 To state a claim for securities fraud under the Exchange Act, a plaintiff must plead "loss causation," specifically, the "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." *Dura,* 544 U.S. at 342, 125 S.Ct. 1627. To plead loss causation, a plaintiff must allege (1) the fraudulent statement that caused the stock price to increase, (2) the disclosure that revealed the statement was fraudulent, and (3) the decline in stock price after the truth became known. *See id.* at 346–47, 125 S.Ct. 1627. A plaintiff does not need to show, however, that the misrepresentation was the only reason for the decline in value. *See In re Daou,* 411 F.3d at 1025.

 Here, with respect to loss causation, plaintiff alleges that Align, on October 24, 2007, announced that (1) utilization rates had decreased from 3.4 to 3.2 in the second quarter of 2007, (2) case shipments for the third quarter of 2007 were 52,000, which was below the prior guidance of 53,000 to 54,000 cases, (3) case shipment guidance for the fourth quarter of 2007 was being lowered to a range of 50,000 to 52,000 cases and (4) the case shipment guidance for fiscal year 2007 was being lowered from a range of 206,000 to 209,000 cases to a range of 202,000 to 204,000 cases. (*See* SAC ¶ 110.) Plaintiff further alleges that "[i]n response to defendants' October 24, 2007 disclosures, the price of Align common stock fell $9.63 per share, or approximately 34%." (*See* SAC ¶ 117.) Plaintiff pleads no facts connecting such drop in stock price to ClinAdvisor. Relying on comments by analysts, plaintiff argues that "the market linked defendants'

disclosures to the inability of the Company to increase utilization vis á vis ClinAdvisor" (*see* Opp. at 25:9–11); none of the alleged comments, however, mentions ClinAdvisor in any manner (*see* SAC ¶ 116). In the absence of any such allegation, or other allegation showing the market became aware of the alleged fraud, plaintiff has not adequately alleged loss causation. *See, e.g., In re NVIDIA Corp. Sec. Litig.,* No. 08–CV–04260 RS, 2010 WL 4117561, at *12 (N.D.Cal. Oct. 19, 2010) (holding plaintiff failed to plead loss causation where "far more plausible" reason for "drop in [company's] stock price [was that] company failed to hit prior earnings estimates").

### II. Insider Trading

The SAC alleges that Prescott engaged in insider trading, in violation of § 10(b) of the Exchange Act. (*See* SAC ¶¶ 171–72.) Plaintiff's insider trading allegations are duplicative of those described above, and, accordingly, likewise fail to state a claim. *See United States v. Smith,* 155 F.3d 1051, 1063 (9th Cir.1998) (noting plaintiff, in alleging insider trading, must allege "a (1) misleading (2) statement or omission (3) of a 'material' fact (4) made with scienter").

### III. Section 20(a)

 Plaintiff alleges, as against all defendants, a violation of § 20(a) of the Exchange Act. (*See* SAC ¶ 173–74.) Under § 20(a) of the Exchange Act, any person who controls a person liable for violating § 10(b) is jointly and severally liable for the violation. *See* 15 U.S.C. § 78t(a). "To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *See Paracor Finance, Inc. v. Gen. Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996). Here, plaintiff's failure to

state a primary violation under § 10(b) precludes plaintiff from stating a claim under § 20(a).

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the SAC is hereby GRANTED, and the SAC is hereby DISMISSED with leave to amend. The Third Amended Complaint, if any, shall be filed no later than March 2, 2012. The Case Management Conference, currently set for April 13, 2012, is hereby CONTINUED to July 20, 2012.

**IT IS SO ORDERED.**